**WELLS et al. v. HENDERSON et al.**

No. 2601.

Court of Civil Appeals of Texas. Beaumont.

Jan. 23, 1935.

Rehearing Denied Jan. 30, 1935.

King, Wood & Morrow and Sewell, Taylor, Morris & Garwood, all of Houston, for appellants.

Orgain, Carroll & Bell, of Beaumont, for appellee Henderson.

Pipkin & Pipkin, Charles S. Pipkin and James H. Pipkin, all of Beaumont, for appellee South Texas & Lumber Co.

Calhoun & Marcus, of Beaumont, for other appellees.

COMBS, Justice.

On the 19th day of March, 1932, while in the course of his employment with Yount-Lee Oil Company, J. E. Henderson was killed in a collision between an automobile in which he was riding and a dump truck operated and driven at the time of the accident by Milton Green. Henderson was survived by his widow, appellee Mrs. Mary Henderson, and five minor children, represented in this litigation by their guardian, appellee First National Bank of Beaumont. Under the provisions of our Workmen's Compensation Act (Vernon's Ann. Civ. St. art. 8306 et seq.), the widow and children were paid their statutory compensation by appellee Texas Employers' Insurance Association. This suit was prosecuted by the widow and the minor children, through their guardian, against Milton Green, South Texas Lumber Company, and W. C. Wells, for damages for the death of J. E. Henderson, based upon the negligence of Milton Green. It was alleged that Green was the servant of South Texas Lumber Company and committed the acts of negligence in the course of this employment; in the alternative that he was the servant of W. C. Wells and committed the acts of negligence in that employment. The petition also alleged that appellee Texas Employers' Insurance Association had paid compensation under the provisions of our Workmen's Compensation Act, and prayed that the amount paid by it be recovered by it out of the judgment in this case; and Texas Em-

**686**

ployers' Insurance Association, by way of answer and cross-action, also prayed for that relief. All the defendants answered by pleas of not guilty and pleas of negligence against J. E. Henderson and the driver of the automobile in which he was riding at the time of the collision. South Texas Lumber Company further answered that Green was the servant of W. C. Wells, and Wells answered that Green was the servant of South Texas Lumber Company. On the verdict of the jury answering special issues, judgment was entered in favor of appellees against Milton Green and W. C. Wells for $42,000 and that none of the parties recover anything against South Texas Lumber Company. This appeal is by W. C. Wells and Milton Green.

■■ In submitting the issue of amount of damages, the charge of the trial court authorized the jury to take into consideration the amount of the "pecuniary loss," if any, suffered by the plaintiffs, and defined the term in so far as it related to the minor plaintiffs as follows: "By 'pecuniary loss,' if such, to the minors is meant the present cash value, if any, of the *pecuniary contributions*, if any, care, if any, education, if any, and counsel, if any, that the minor plaintiffs would have, if they would have, in reasonable probability received from their father, J. E. Henderson, during their minority, and during their father's lifetime had he lived." This definition is assailed upon two grounds, preserved by proper exceptions in the trial court, to wit: First, that the term as used in the charge does not confine the jury's consideration to cash money given by the parent to the minors, but means anything having a value in money, including "care" and "education" and, therefore, permits a double recovery; and, second, the term "pecuniary contribution" has a legal meaning requiring definition for the guidance of the jury and the court refused to define it.

The words "pecuniary loss" are words of common use, having no special legal or technical meaning, and it was not necessary for the court to define them. Houston Gas & Fuel Co. v. Perry (Tex. Civ. App.) 55 S.W.(2d) 901; G., H. & S. A. R. Co. v. Heard (Tex. Civ. App.) 91 S. W. 371. But since the court defined the term, it is necessary for us to consider whether or not the definition as given was subject to the assignments urged against it. We do not think that it was. Like "pecuniary loss," the words "pecuniary contributions," as used in the definition, are words of ordinary use and simple meaning. They mean simply "money contributions." There was nothing in the context of the charge which tended to give them any different

meaning from the one ordinarily given them. Counsel for appellants in their brief concede that, "The court in his charge to the jury in this case evidently meant by the term 'pecuniary contributions' gifts or donations made in actual money, as distinguished from gifts and donations in things other than money." By use of the term the court submitted just that to the jury and nothing else. "Pecuniary contributions," when used in a context which submitted "care," "education," and "counsel" as separate and distinct elements of recovery, could only mean to the mind of the average juror contributions of money. It would be unreasonable to assume that the jury gave the term a broader meaning so as to include these other elements, thereby considering such elements twice in fixing the amount of recovery allowed the minors. It is reasonable to assume that the jury did not intend to allow double recovery and that they considered the context as specifically limiting the meaning of "pecuniary contributions" to contributions of money. International & G. N. R. Co. v. White (Tex. Civ. App.) 120 S. W. 958, 959, 960.

On the effect of particular words as limiting a term of broader meaning, in the above case the Court of Civil Appeals, discussing a charge where the term "pecuniary aid" was used, as against the assignment of "double damages," said: "When punitory damages are not involved, it seems reasonable to suppose that fair-minded jurors would not be inclined to award to a plaintiff more than actual compensation for the injury sustained, unless directed so to do by the court, and would be disposed to adopt that construction of the charge, if permissible, which would not result in awarding double and unjust damages. If it be conceded that the words 'pecuniary aid,' when used alone or not restricted by other language, are broad enough to include counsel and advice, yet, as those words are used in the charge complained of, it is not believed that they should be given such broad signification."

■■ We overrule the assignment that the amount of the judgment was excessive. J. E. Henderson was thirty-six years of age at the time of his death, with a life expectancy of thirty-one years. He left surviving him his widow, to whom was awarded $10,000, and five minor children, ages eleven, eight, two twin boys age two, and a baby girl born after his death. The $32,000 awarded the minors was apportioned by the jury among them. At the time of his death Henderson was earning $1,755; he was never out of work; was

dependable, sober, and industrious; employed in the electrical department of the Yount-Lee Oil Company and an excellent workman, skillful in his trade or work; was a man of average intelligence, in some respects above the average.

Ordinarily the amount of damages to which a party is entitled is primarily and peculiarly within the province of the jury. G., H. & S. A. R. Co. v. Le Gierse, 51 Tex. 189. And in the absence of a showing that passion, prejudice, or other improper motive influenced the jury in assessing the damages, the amount assessed by them will not be set aside as excessive. 13 Tex. Jur. 262; McCormick v. Missouri, K. & T. R. Co., 25 Tex. Civ. App. 321, 61 S. W. 983. There is nothing in the record to suggest that the verdict was the result of "corruption, prejudice or passion" or other improper motive. Henderson was earning $1,755 per year at the time of his death. He was only thirty-six years old and possessed, to a high degree, those qualities of mind, character, and industry that assure a workman recognition and due promotion by his employers. And while the recovery allowed by the jury is a large one, the evidence amply supports it and it is not for us to say it was not honestly and fairly arrived at. We think the reasoning of Chief Justice Hightower in T. & N. O. R. Co. v. Harrington (Tex. Civ. App.) 241 S. W. 250, fully supports this judgment. See, also, Hines v. Mills (Tex. Civ. App.) 218 S. W. 777.

■ The following definition of "proximate cause" was given by the trial court: "You are also instructed that the term 'proximate cause,' as hereinafter used, means that cause which in a natural and continuous sequence, unbroken by any new and independent cause, produces the result complained of and without which that result would not have occurred *and in the light of the attending circumstances such result, or a similar one, ought to have been reasonably foreseen by a person of ordinary care and prudence.*" (Italics ours.) The following exceptions were reserved to that portion of the definition written in italics:

"Defendants object and except to the definition of 'proximate cause' contained in the court's main charge, for the reason that the said charge wholly ignores the question that for a person to anticipate or to foresee the result of an act committed by him must use only ordinary care. In other words, the question of the exercise of ordinary care or the question of foreseeability is only required." And further: "Defendants further object and

except to the definition of proximate cause for the reason that same is on the weight of the evidence and assumes that the death of J. E. Henderson was caused by some of the acts complained of; that for a definition to be correct in law the jury should be instructed substantially that 'proximate cause' means that cause which is a natural and continuous sequence, unbroken by any new and independent cause, produces an event, without which the result complained of, or some similar result would not have occurred, and for an act to be a proximate cause that it ought to have been anticipated by an ordinarily prudent person in the exercise of ordinary care, in light of the attendant circumstances." In support of this assignment appellants say: "It will be seen that this instruction placed on the defendants a greater burden than that imposed by law for if the jury believed that the defendants in the exercise of the highest degree of care known to the law could have anticipated that the injury would follow the act, then they were authorized to find the act to be a proximate cause of the injury; whereas, under the law, the defendants were only required to exercise ordinary care in anticipating and foreseeing that the injury would follow the act, and if, when exercising only ordinary care, the defendants could not have anticipated that the injury would follow the act, then the jury would not be authorized in finding that the act was a proximate cause of the injury." These exceptions were properly overruled by the trial court. Texas & P. R. Co. v. Short (Tex. Civ. App.) 62 S.W.(2d) 995; Panhandle & S. F. R. Co. v. Miller (Tex. Civ. App.) 64 S.W.(2d) 1076, 1077; Baughn v. Platt (Tex. Com. App.) 72 S.W.(2d) 580; St. Louis, B. & M. R. Co. v. Cole (Tex. Com. App.) 14 S.W. (2d) 1024. The definition given strictly conforms to the test of proximate cause stated by Judge Phillips, speaking for the Supreme Court, in Galveston, H. & S. A. R. Co. v. Bell, 110 Tex. 104, 216 S. W. 390, 391, where he said: "The test as to whether a given act may be deemed the proximate cause of an injury, is simply whether in the light of all the attending circumstances the injury was such as ought reasonably to have been anticipated as a consequence of the act." In the Miller Case, supra, the trial court defined "proximate cause" as "that cause which directly produces the injuries and damages, and without which the injuries and damages would not have happened, and the happening of which might reasonably have been contemplated as a natural and probable consequence." The defendant there objected as

follows: "(1) 'Because it fails to apply the standard of ordinary care and prudence to the element of foreseeability.'" The Court of Civil Appeals in holding that the objection was without merit wrote as follows: "Any inquiry as to proximate cause presupposes the existence of negligence, and therefore, of course, the existence of a failure to exercise ordinary care. We think that, after a jury has determined issues of negligence and therein had found that, in certain acts or omissions, the defendant failed to exercise that degree of care and prudence which an ordinarily prudent person would have done under the same or similar circumstances, it is sufficient, in order to enable them to further determine whether such acts or omissions were proximate causes of certain injuries, that they be informed that, to be such, the acts or omissions must have been such that it could reasonably have been foreseen that some such injury would likely result. The definition in question did that. It would have been better for the definition or explanation to have advised the jury to the effect that the proximate cause was not necessarily the immediate cause. We cannot say that even that was not implied in the definition given." The Short Case, supra (writ refused), also supports this definition. In that case Judge Funderburk supported his conclusions by an extended argument and by citing and reviewing many authorities.

 We give in full appellant's sixth proposition: "The evidence in the record showing that J. W. Ewing, a white man and an employee of the South Texas Lumber Company, and occupying a position of authority in such employment, carried a negro employee by the name of Jesse Caleb to two certain gravel cars located near Amelia, in Jefferson County, Texas, on the 18th day of March, 1932, and that he went back out to the cars once more that day in his automobile to see how the men were getting along on the job, and that on his second trip he got out of his automobile and climbed up on one of the cars to see how the men were progressing with the work, and all of the testimony in the record showing that no one connected with the appellant W. C. Wells ever went to the gravel cars except the drivers of Wells' trucks, and there being no testimony in the record whatsoever as to other white men going to or about the cars other than J. W. Ewing, nor any testimony as to any occasion or reason for any other white man being about them, and the witness Elmo Chaison testifying that he was sent to the cars by W. C. Wells on the 18th of March, 1932, for the purpose of transporting the gravel therein contained in the truck he was driving, and that there was present at the cars the negro Jesse Caleb, and that while at the cars 'a white man' drove up in an automobile, got out of the automobile and came over to the gravel cars and got up on the side of the cars and looked in and made certain statements to the witness, and the record showing that Jesse Caleb, the employee of the South Texas Lumber Company, and in attendance upon court at the time of the trial, was not placed on the stand by the South Texas Lumber Company, the further testimony of Elmo Chaison that 'the white man' who came to the cars directed him and his fellow workers where to take the gravel, what route they should take, how they should distribute it, and as to other details of the means and methods of doing the work, was admissible in evidence on the question of whether or not the South Texas Lumber Company was exercising control over the men hauling the gravel as to the means and methods of doing the work, even though the witness Chaison did not know the name of the white man who came to the cars and did not recall his appearance, for that the circumstances outlined were sufficient to establish circumstantially the identity of the man coming to the cars as being J. W. Ewing, and to justify and require the admission in evidence of the statement attributed to him, the question of whether or not the man mentioned was in fact J. W. Ewing being a matter for the determination of the jury from the circumstances shown."

There was no evidence in the record identifying J. W. Ewing as the "white man" referred to in appellant's proposition. If such a "white man" appeared on the scene of the accident, there was nothing—not even a circumstance—tending to identify him as an employee or agent of South Texas Lumber Company. As to the admissibility of the proffered testimony it is said in 17 Tex. Jur. p. 910: "While the law does not attempt to tell a juror the amount or kind of evidence that ought to produce belief in his mind, it is essential to a sustainable conclusion that there be more than a mere scintilla of evidence; the matters that are relied upon must be of some probative force or do more than raise a mere suspicion or surmise of the existence of the fact which is sought to be proved."

Moreover, we think that on the record before us, Green was the servant and agent of W. C. Wells and not South Texas Lumber Company, as a matter of law. We will not discuss the evidence on this point further than to say that the undisputed evidence, as

we construe it, establishes that Green was driving Wells' truck; that he was employed by Wells and paid by Wells; that Wells, and not South Texas Lumber Company, directed and controlled the manner in which his work was to be performed; and that he was engaged in such work as directed by Wells at the time the accident occurred. These facts, as a matter of law, fix Green's status as that of an employee of W. C. Wells. Security Union Ins. Co. v. McLeod (Tex. Com. App.) 36 S.W.(2d) 449; Southern Surety Co. v. Shoemake (Tex. Com. App.) 24 S.W.(2d) 7; Manning v. Texas Employers' Ins. Ass'n (Tex. Civ. App.) 67 S.W.(2d) 389; McNamara v. Leipzig, 227 N. Y. 291, 125 N. E. 244, 8 A. L. R. 480. The proffered testimony could have raised no issue against the agency so established by the uncontroverted evidence.

■■■ On motion for new trial, for the first time, appellants excepted to certain argument of counsel for appellees which they present in their seventh proposition, as follows:

"That portion of the opening argument to the jury of one of the attorneys for the widow and children of the deceased J. E. Henderson as follows:

" 'It is my thought, gentlemen, if ever Mrs. Henderson and those minor children, cast upon the world as they are without the arm of their father and husband to support them, and without his voice and mind to counsel them, if ever anybody was entitled to the full amount sued for, $85,000.00, they are entitled to it, but I do say, gentlemen, I believe you gentlemen, even if you don't agree with me, certainly are justified under the evidence in the case and the loss of these people, in saying that those damages are, answering Special Issue No. 36, not one penny less than $65,000.00. Gentlemen, you have got to look at this matter from their viewpoint. All I ask is this, that with the evidence, you look at the evidence in this case on the facts and if you can, in your imagination peer deep into the hearts of those children to realize their loss, to realize what has happened to them and what they will miss from now into eternity, and then with your conscience assess the damages, in answer to Special Issue No. 36' was so highly inflammatory and prejudicial as to require the setting aside of the verdict of the jury and the granting to the appellants of a new trial in this cause, and especially is this true when the harmful effect of such argument is made manifest by the excessive verdict returned by the jury."

In this argument appellants direct our attention specifically to the language: "You look at the evidence in this case on the facts and if you can, in your imagination peer deep into the hearts of those children to realize their loss, to realize what has happened to them and what they will miss from now into eternity, and then with your conscience assess the damages, in answer to Special Issue No. 36."

The proposition is insufficient to support the argument that the jury was called upon "to place themselves in the position of the claimants and to consider the question of damages from the standpoint of claimants and not from the standpoint of the evidence." The only point made in the proposition is that the argument—all that part of it assigned— was "highly inflammatory and prejudicial." In the first place, the exception is too general to direct the trial court's attention to the point now made, that is to say, it was not called directly to the court's attention that appellants were excepting to it on the ground that the jury was asked to place themselves in the position of claimants. This argument was made by counsel for appellees in their opening address to the jury; as stated above, no exception was made at the time and the point was not called to the trial court's attention until motion for new trial. The nature of this argument brings it within the rule announced by Chief Justice Hightower of this court, in Texas Employers' Ins. Ass'n v. Moore, 46 S.W.(2d) 404, 408, when he said: "Another contention made by appellant is that the trial court was in error in refusing to grant it a new trial because of improper argument by one of appellee's counsel before the jury. The bill, in this connection, fails to show any objection whatever to the argument at the time it was made, and also fails to show that appellant made any request of the court at any time to instruct the jury to disregard the argument. This being true, this court would not reverse for improper argument by counsel, unless the same was of such nature, that is to say, so highly inflammatory or prejudicial, that objection to it and request for instruction to disregard it would probably not have removed the effect of the argument. We have examined the bill in this connection, and find that the remarks of counsel now complained of were not of an inflammatory nature at all."

Moreover, we think the argument was legitimate and proper. It directed the jury's attention to elements which the court had properly charged them to consider in assessing damages. We are fully aware of the fact that our courts have gone a long way in re-

cent years in reversing cases on the ground of improper argument of counsel. But we think there is still left some legitimate function for argument of counsel in discussing issues before a jury, and that the rules do not yet require that an attorney shall so present his client's case that it would be necessary for a bystander to inquire when he is through which side of the case he is on in order to ascertain such fact.

The witness Stone, superintendent for South Texas Lumber Company, over the objections of appellants, gave the following testimony. He read an account of the accident in the Sunday morning paper and called appellant Wells about it Monday morning. This statement was followed by the following questions and answers:

"Q. Did you call up Mr. Wells personally about it? A. I talked to Mr. Wells personally.

"Q. What did he say, if anything, in regard to it? * * * The court has ruled you may answer the question Mr. Stone. A. Mr. Wells said I did not have anything to worry about.

"Q. You have talked to Mr. Wells on several different occasions about this situation, haven't you, Mr. Stone? A. I do not recall but one other conversation.

"Q. Now, one other conversation. Have you talked to him any around the courthouse since this trial has been going on? A. Just casually.

"Q. In any conversation you have had with him, has he ever said to you, or has he ever denied to you—rather, I will put the question a little different—has he ever said to you he thought Milton Green was your agent on that date? A. Mr. Wells has never indicated to me he thought Green was our agent.

"Q. Has he ever said to you he thought Milton Green was not your agent on that date? A. I don't believe Mr. Wells has ever said for sure just whose agent. He just never has said he thought Green was our agent, though.

"Q. Have you ever discussed that feature of the case with him, feature of the situation with him? A. I think just casually. I don't believe I have ever asked him that question."

The principal objection offered by appellants to this testimony by the witness Stone was to the effect that it carried to the jury the suggestion "that there was insurance in the case." The objection was properly overruled. There was not a suggestion of insurance in the case. Stone's testimony of the statement made to him by Wells was admissible as a declaration against interest, on the issue as to whether or not Wells considered Green his servant on the occasion in question. Of this testimony appellants say in their argument: "It carried with it the double suggestion that Wells was admitting liability, and that there was insurance in the case." If the evidence tended to show that "Wells was admitting liability," as appellants concede, even if it had the other effect— which in our judgment it did not have—then appellants were required to protect their interest by requesting a charge restricting the evidence to the relevant issue; the court, on his own motion, was not required to give such a charge. Shumard v. Johnson, 66 Tex. 70, 17 S. W. 398; Blum Milling Co. v. Moor-Seaver Grain Co. (Tex. Com. App.) 277 S. W. 78. The other objections, that the testimony was "irrelevant, immaterial to any issue in the case, inflammatory and prejudicial to the rights of each of said defendants," are overruled as without application.

We give in full appellant's fourteenth proposition: "The trial court erred to the prejudice of the appellant W. C. Wells in failing to submit to the jury Special Issue No. 9 requested by said appellant, inquiring of the jury as to whether reasonable persons in the position of South Texas Lumber Company, Inc., and W. C. Wells would have mutually understood that the South Texas Lumber Company, Inc., and not W. C. Wells, was to have the right to control and direct the manner, means and methods as to how the gravel in question should be hauled."

This point does not present error. As said above, we think the uncontroverted evidence established that Green was the agent of Wells, but if it did not, Wells' relation to the suit was fully and fairly presented to the jury by special issues 13 to 17, inclusive, and 50, 51, and 53. In any event, these questions submitted every essential fact issue on the question of agency fairly and accurately to the jury, and the jury answered them adversely to Mr. Wells.

The court did not commit reversible error in permitting Milton Green to testify "that somebody, not W. C. Wells, came and got the citation served on him in this case." The testimony could not have been harmful. It was too indefinite; it failed to identify any person or to show that the person who, in fact, called for the citation, was connected with any party to the suit in any capacity. The force of this criticism is illustrated by the fact that the law firm, Sewell, Taylor, Morris & Garwood, who signed their names to

the pleadings as representing W. C. Wells, also signed their names to the pleadings for Milton Green. If any inference is to be indulged, it would be that he gave the citation to the attorneys.

Appellants present four points of misconduct by the jury. Point 1 concedes that the evidence given by the jurors was conflicting as to whether or not they first agreed to find for the claimant in the sum of $42,000 and then answered the issues submitted to them by the court in order to effect that result; the contention is that because of the character of the testimony this court is not bound by the finding of the trial court and can and should reverse his conclusion. The second point presents the proposition that whether or not such prior agreement was had, the jury answered the issues in a manner and for the express purpose of having the claimants recover the sum of $42,000. The facts on these two issues were covered by a most extensive examination of the jurors. This testimony was all before the trial court for his careful consideration in determining the merits of the motion for new trial. It would serve no useful purpose to quote from the large record made by the testimony of the jurors. The trial court sustained these fact issues against appellants, and in our judgment his conclusion has abundant support.

■■■ The third point of misconduct is: "The undisputed testimony heard upon the presentation of the appellants' motion for a new trial showing that the juror J. H. Simms informed and told the balance of the jurors when they were considering the special issue dealing with unavoidable accident, that if such issue were answered in the affirmative that the claimants in this cause could not recover, and there being no evidence introduced contradicting such testimony, the misconduct mentioned was established as a matter of law, and the trial court had no discretion in the matter but to grant a new trial, there being no question possible, under the law, as to the injurious effect of the misconduct mentioned."

The principle of law contended for by appellants is supported by the majority opinion in Houston Electric Co. v. De Cuir (Tex. Civ. App.) 69 S.W.(2d) 231, provided the undisputed testimony establishes the misconduct. In that case there was a dissenting opinion by Judge Graves. But we cannot agree with appellants' contention that their proposition is supported by the undisputed evidence. The only statement made by appellants is the following short quotation from an extensive examination of the juror Simms:

"Q. What did you tell them would happen if you answered it 'yes'? A. That they would not—that nobody would get nothing.

"Q. Mr. Simms, you look like— A. I thought at that time, and I think now, that the widow ought to have got some damages."

The testimony of the jurors Cook, McConnico, and Wagner was to the effect that nothing entered into their verdicts except the evidence. The juror Simms testified that nothing entered into his verdict except the evidence and that the jurors had no discussion of any kind as to who was going to recover or would not recover. The effect of this character of testimony by this juror was to contradict his testimony brought forward by appellants upon which their proposition is predicated. It should also be borne in mind that Mr. Simms was the only witness who testified for appellants on this issue, and this juror was impeached by appellants introducing a written statement signed by him which was contradicted by his oral testimony on the witness stand. Bradley v. Railway Co. (Tex. Com. App.) 1 S.W.(2d) 861, is authority for the proposition that where a juror's testimony is impeached the trial judge may disregard his entire testimony. On the whole record the findings of the court that the statement relied upon by appellants was not made—if necessary to indulge that finding—should be approved by us.

■■■ The fourth point of misconduct is appellants' thirteenth proposition: "The jury sitting in this case was guilty of material misconduct prejudicial to the rights of the appellants in that the undisputed evidence shows that before the jury had returned its verdict into court statements were made in the presence and hearing of at least three jurors to the effect that the truck involved in the accident in question was covered by liability insurance, and the evidence fails to show beyond reasonable doubt that none of the jurors were influenced by said statements to return said verdict into court."

We have carefully examined the testimony on this proposition and cannot agree with appellants' contention that its proposition is supported by "the undisputed evidence." Thus appellants offered in evidence a statement signed by the jurors Ed Pleasant, L. G. Ferguson, P. H. Causey, J. H. Simms, and M. W. Maske, in which this statement was made: "Each one of us hereby certifies that there was no argument or discussion in the jury room relative to any insurance that might have been carried on the truck owned by the defendant Wells."

692

The witness William Crysel testified:

"Q. What did you hear? A. About this insurance proposition, we didn't discuss anything about the insurance.

"Q. Something was said about insurance that you heard? A. I guess everyone knew it was insured.

"Q. Not generally what they knew. What I want you to do is tell me what was said by anybody up there on the jury about insurance? A. I don't remember.

"Q. Sir? A. I don't remember.

"Q. You remember something was said, don't you? A. No.

"Q. You said all of them heard what you heard, didn't you a while ago? A. If they heard that they heard more than I did. I have got pretty good ears. * * *

"Q. * * * Mr. Crysel—you know there was something said about insurance in the jury room, don't you? A. I don't know that there was.

"Q. Sir? A. I don't know that there was.

"Q. Will you tell me and this court there was nothing said about insurance in the court room? A. If they discussed anything about the insurance I didn't hear it."

The juror A. C. Cooke testified:

"Q. Mr. Cooke, you say there was no discussion from the jury about insurance—Wells having carried insurance? A. No, sir, I did not hear no discussion.

"Q. Sir? A. I didn't hear no discussion."

The juror L. G. Ferguson testified:

"Q. Mr. Ferguson, do you recall whether or not anything was said there by any of the jurors about whether Mr. Wells had insurance? A. No, sir.

"Q. Covering his truck? A. No, sir, I didn't hear that.

"Q. You didn't hear that? A. No, sir.

"Q. Did you, in your deliberations, I mean in your own mind, did you think of the fact or wonder whether or not Wells had insurance covering his truck? A. No, sir.

"Q. That just didn't occur to you? A. No, sir.

"Q. And you did not hear any discussion about that? A. No, sir."

It would serve no useful purpose to quote further from the testimony of the jurors to show that appellant's proposition presents a controverted issue. In answer to their contention three of the jurors discussed insur-

ance apart from the rest of the jury, the juror Cooke testified:

"Q. Was the jury all in the same room all the time? There are two rooms up there in the jury room. They are connecting rooms? A. Yes, sir, they were together, of course some times some of them were in the bathroom, but we were all pretty much together all the time."

Thus it appears that as to all of the matters of alleged misconduct of the jury which we have discussed above it was at most in each instance a disputed fact as to whether the misconduct did in fact occur. Were this a case where the occurrence of the misconduct was established as a matter of law, then the question of whether it was harmful would also be a question of law. But here the judgment of the trial court overruling the motion for new trial is in effect a finding that the alleged misconduct did not occur. Such finding having abundant support in the record, it is no more the province of this court to disturb it than it would be to set aside a finding made by the trial court on any other issue of fact having support in the evidence. Bradshaw v. Abrams (Tex. Com. App.) 24 S. W.(2d) 372.

It follows that the judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.