British American Ins. v. Lewis 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-94-325-CV

     BRITISH AMERICAN INSURANCE COMPANY,
                                                                                              Appellant
     v.

     CLAUDETTE LEWIS,
                                                                                              Appellee
 

From the 66th District Court
Hill County, Texas
Trial Court # 32831
                                                                                                    

O P I N I O N
                                                                                                    

      Charles Lewis sustained a hand injury on April 16, 1992, while employed by Austin Bridge
& Road. His employer's workers' compensation carrier, British American Insurance Company,
began paying him benefits for the injury. Following his hand injury, Charles was hospitalized
twice under psychiatric care as a precaution against suicide. Nevertheless, he killed himself on
July 25 by a self-inflicted gunshot. Claudette Lewis, his wife, sued British American after it
denied her claim for death benefits under the Workers' Compensation Act. She alleged that
British American had violated its common-law duty of good faith and fair dealing as well as article
21.21 of the Texas Insurance Code. The jury found an intentional breach of the duty of good faith
and fair dealing, a knowing violation of article 21.21, and awarded Claudette $250,000 for past
and future mental anguish, plus reasonable attorney's fees equal to twenty percent of her recovery. 
After Claudette elected to recover based on a knowing violation of article 21.21, the court entered
a judgment against British American for $964,520.55, which included $250,000 actual damages,
$500,000 additional damages, $150,000 attorney's fees, and $64,520.55 in prejudgment interest. 
British American's principal points attack the legal and factual sufficiency of the evidence
supporting the liability and damage findings. We will affirm.
SOME SUICIDES ARE COMPENSABLE
      On April 16, 1992, the date of Charles' hand injury, and at the time of his death on July 25,
section 3.02 of article 3808 provided:
            An insurance carrier is not liable for compensation if:
. . . 
      (2)  the injury was caused by the employee's wilful intention and attempt to injure himself or
to unlawfully injure another person; . . . .
Act of December 12, 1989, 71st Leg., 2d C.S., ch. 1, § 2.51, 1989 Tex. Gen. Laws 1, 14,
repealed by Act of May 12, 1993, 73rd Leg., R.S., ch. 269, § 5(2), 1993 Tex. Gen. Laws 987,
1273 (current version at Tex. Labor Code Ann. § 406.032(1)(B) (Vernon Pamph. 1996))



[hereinafter section 3.02].
      In 1943, the Texas Supreme Court adopted the following legal test to determine whether a
suicide was compensable under the workers' compensation statutes:
[W]here there follows as a direct result of the accident an insanity of such violence as to cause
the victim to take his own life through an uncontrollable impulse or in a delirium of frenzy
without conscious volition to produce death, there is a direct and unbroken causal connection
between the physical injury and the death; however, where the suicide is the result of
voluntary and willful choice determined by a moderately intelligent mental power with
knowledge of the purpose and effect of the act, even though dominated by a disordered mind,
a new and independent agency breaks the chain of causation.
Jones v. Traders & General Ins. Co., 140 Tex. 599, 169 S.W.2d 160, 162 (1943). In 1975,
however, the Texas Supreme Court rejected the Jones test in favor of the following:
[W]here the effects of injuries suffered by the deceased result in his becoming dominated by
a derangement of the mind which impairs the ability to resist the impulse to take his own life
to the extent that the decedent was in fact unable to control it, the suicide cannot be termed
as willful under [the Act].
Saunders v. Texas Employers' Ins. Ass'n, 526 S.W.2d 515, 517-18 (Tex. 1975). Thus, under the
Saunders test, "if the effects of an injury or its treatment so acts upon the will of the injured
workman so that [his will] is not operating independently at the time of the suicide, then the chain
of causation would appear to be unbroken and the fact that the decedent knew of the physical
consequences of his act would be irrelevant." Id. at 517. The Texas Supreme Court has neither
altered nor abolished the Saunders test since adopting it.
THE INJURY AND ITS AFTERMATH
      Charles Lewis, a thirty-three-year employee of Austin Bridge & Road, sustained a serious
hand injury on April 16, 1992, when his hand was caught in a compressor belt and crushed. At
the time of the injury, Lewis was working in the company shop while he awaited a decision on his
request for a driver's license waiver, which would allow him to continue to drive a truck even
though he suffered from an impairment of his eyesight. When Claudette Lewis arrived at the
hospital in Fort Worth, she found that her husband—who usually worked from fifty to ninety hours
a week and had missed only three days of work in thirty-three years—was "agitated and nervous"
and "flat scared to death." Dr. Sorokolit, an orthopedic surgeon, performed surgery on Charles'
hand on April 16 and released him from the hospital the next day.
      When the Lewises returned to their home in Whitney, Charles immediately began a pattern
of behavior that was most unusual for him, according to his wife. Claudette, who described her
husband as someone who enjoyed being outdoors, gardening, yard work, caring for his cats, and
a man with a hearty appetite, said that Charles had difficulty sleeping, was morose and lethargic,
stayed inside the house and walked a lot, lacked an appetite, and showed no interest in his usual
activities. On May 3, Claudette found him in bed on his hands and knees, "thrashing around,"
"rocking from side to side," and "just staring right through you." He had either removed or
attempted to remove the metal pin from his middle finger, which had been inserted during surgery,
and he and the bed linens were covered in blood. Claudette immediately took him to the
emergency room at the Whitney hospital, where he was seen by Dr. Gipson and Dr. Hartman and
admitted. At admission, Charles' blood pressure was extremely high, and Dr. Hartman began a
course of treatment to lower it.



      Jim Pipkin, the vice-president of workers' compensation claims and senior claim adjuster for
British American, had already approved temporary compensation benefits and medical expenses
related to Charles' hand injury when he learned that Charles had been admitted to the Whitney
hospital. Pipkin immediately hired Linda Raney, an employee of Excel Rehabilitation
Consultants, to "investigate the circumstances," help manage and coordinate Charles' care, and
report back to British American. When Raney visited Charles in the hospital, she found him to
be "uncommunicative, unresponsive, primarily even to his family members." After talking with
the doctors and the Lewis family, Raney contacted Pipkin and recommended that Charles receive
immediate psychiatric evaluation and treatment. Pipkin approved the request and Raney arranged
for Dr. Ricardo Schack, a psychiatrist in Waxahachie, to see Charles on an emergency basis. 
When Charles was discharged from the Whitney hospital on May 7, Claudette and several family
members drove him that same day to Dr. Schack's office.
      Dr. Schack, who examined Charles on May 7, found that he was suffering "severe
psychological distress due to disability." Based on his initial evaluation, Dr. Schack believed that
Charles should be immediately hospitalized, but relented because "the family wanted him to work
through things on an outpatient basis." Dr. Schack saw Charles again on May 11, found that he
was responding well to the medication prescribed on May 7, and agreed that he could remain an
outpatient. Because of his high blood pressure, Charles continued to see Dr. Hartman in Whitney,
who monitored his blood pressure on a regular basis in conjunction with Dr. Schack's treatment.
      However, Charles continued his aberrant behavior at home. On May 14 Dr. Schack phoned
Linda Raney and told her that he was going to see Charles again on May 18 and that he believed
a brief hospital stay might be necessary to determine which type of medications would best
stabilize his condition. On May 18 Dr. Schack admitted Charles to Willowbrook Hospital in
Waxahachie because he was not eating, was reclusive and distant from his family and friends,
depressed, despondent, unable to sleep or concentrate, and just the evening before admission had
pulled the metal pin out of his middle finger. As a precaution, Dr. Schack treated him under close
supervision in the Psychiatric Intensive Care Unit because he was "voicing suicidal ideation." Dr.
Schack discharged him "against medical advice" on May 30, at which time he found Charles not
to be "actively suicidal," but "at risk."
      When Charles returned home, according to Claudette, his behavior became even more
irrational, with pronounced signs of paranoia. He remained in bed most of the time, lying in a
"fetal position"; he believed that "people [were] watching what he [was] doing," that the staff at
Willowbrook Hospital had tried to poison him and had "bugged" his room; and he refused to allow
any of his children to touch him, believing they were "against him." He continued to be reclusive,
listless, and avoided eating to the extent that his weight had dropped at least twenty-five to thirty
pounds. Claudette became increasingly alarmed when Charles tried to obtain access to a firearm. 
He not only asked her to unlock the gun case at home, purportedly so that he could pawn one of
his guns, but she also learned he had asked one of his friends for a pistol. During this period at
home, Dr. Schack saw him on June 1 and June 4 at his office in Waxahachie.
      Dr. Schack saw Charles again at his office on June 15 and, faced with signs of his increasing
instability, recommended his immediate hospitalization. Claudette and some of the children drove
Charles from Dr. Schack's office to Willowbrook Hospital, with him "ranting, raving and
screaming" all the way there. On the way to the hospital, they had to prevent him from jumping
from the car while it was moving. Dr. Schack readmitted Charles to Willowbrook Hospital on
June 15, where he was again placed under close supervision as a precaution against suicide. Dr.
Schack discharged him on June 21, noting in the discharge summary that he was no longer
evidencing suicidal tendencies and could be treated as an outpatient.
      Dr. Schack saw Charles for office visits on June 22, June 29, and July 6, stating in his
progress notes for the June 29 visit that Charles was "actually doing the best that he has done since
I have known him." Charles, however, continued his reclusive and abnormal behavior at home. 
Although Claudette professed that she was not dissatisfied with Dr. Schack's treatment of her
husband, she nevertheless talked to Linda Raney about obtaining a "second opinion" from another
psychiatrist. Raney obtained Jim Pipkin's approval of a second psychiatric referral, and on July
7 Charles saw Dallas neuropsychiatrist Dr. Jeffrey Glass, whom Raney had recommended.



      In an effort to break Charles' pattern of behavior, Claudette said that Dr. Hartman told her:
"You have coddled; you have begged; you have pleaded"; and "it's not working." He suggested
that she "get tough" and "push him." Claudette said that even Dr. Schack suggested,
metaphorically, that she should "give him a swift kick in the butt." Relying on these suggestions
from the doctors, Claudette said she began to be "more forceful" with Charles, and "quit waiting
on him hand and foot." In fact, on July 24—the day before his death—she told him: "Charles, if
you don't get out of that bed and come back to the land of the living and help me in this yard and
help me keep this place, I'm going--I may get in that car and leave and never come back."
      On Saturday, July 25, Charles ate breakfast and immediately went back to bed. Claudette had
to go to the grocery store, and just before she left, Charles questioned her about how long she
would be gone. As Claudette returned from the store, an ambulance sped past her, and she
noticed a number of cars and people at her residence. She soon learned that Charles had shot
himself in the head in the backyard of their home and was dead.
DENIAL OF DEATH BENEFITS
      Jim Pipkin received notice by phone of Charles' suicide on Monday, July 27. He could not
remember who called him, but believed the call came from someone who worked for Austin
Bridge & Road. On July 28, the day of Charles' funeral, Pipkin mailed to the Texas Workers'
Compensation Commission (TWCC) in Austin a notice that British American was terminating
Charles' temporary compensation benefits for his hand injury, giving his death as the reason for
termination. In the portion of the TWCC form devoted to "NOTICE OF REFUSED OR
DISPUTED CLAIM," Pipkin stated:
FATAL BENEFITS HAVE NOT BEEN REQUESTED AND WOULD NOT BE
APPROPRIATE DUE TO THE MANNER AND MEANS OF [CHARLES'] DEATH, HIS
DEATH IS NOT RELATED TO HIS JOB AND BECAUSE IT FALLS WITHIN A
STATUTORY EXCEPTION OF COVERAGE. SEE ART. 8308 SEC. 3.02 (1989).
Claudette received a copy of the TWCC notice on the Friday following her husband's funeral. 
Later, she discussed the matter with her children, sought legal advice, and decided to pursue her
right to death benefits.
TWCC HEARINGS
BENEFIT REVIEW CONFERENCE
      She participated in a Benefit Revenue Conference (BRC) on November 23, 1992, at which
both she and British American were represented by legal counsel. At the hearing, Claudette
presented a letter from Dr. Schack, dated November 19, in which he stated:
[T]here is very little question in my mind that Mr. Lewis was an extremely proud man
that was devastated by the fact that he could no longer work, and the most frightening thing
to him was not being able to provide for his family. He was extremely proud, and, in my
opinion, he indeed suffered [from] a derangement caused by his accident that cornered him
into taking his own life.
This was an extremely uncharacteristic behavior for Mr. Lewis, who was not prone to
theatrical actions, and there is very little question in my mind that the suicide was due to his
work related injury.
      Relying on the Texas Supreme Court's holding in Saunders, Claudette argued that she was
entitled to death benefits because Charles' mental derangement, which ultimately caused him to
commit suicide, related to his on-the-job hand injury and substantially impaired his ability to resist
killing himself. British American contended that it was not liable for death benefits because
Charles' death resulted from a willful intent to injure himself. Leah Kitchens, the BRC hearing
officer, recommended in her December 22, 1992, report that "this claim for death benefits be
accepted as compensable by [British American]." 
      On November 30, prior to the issuance of the BRC hearing officer's report, Pamela
Peavy—the attorney who represented British American at the BRC hearing—wrote Pipkin to
inform him that Claudette's claim for death benefits was scheduled for a Benefit Contested Case
Hearing in January 1993. In her letter, Peavy reviewed the relevant time deadlines for the
upcoming hearing and recited for Pipkin pertinent facts that were reflected in British American's
claim file, including the following:
      •    In his report of the May 7 initial evaluation, Dr. Schack indicated that Charles "was
profoundly depressed due to the injury to his hand," and that Dr. Schack's initial
diagnosis was "major depression, single episode; hand injury; and severe psychosocial
stressors due to disability";
      •    In a May 11 letter to Linda Raney, Dr. Gipson informed her that "there is no question
in his [the doctor's] mind that [Charles'] depression was secondary to his injury";
      •    Charles was hospitalized twice as a precaution against suicide; and
      •    Dr. Jeffrey Glass' August 4 letter to Pipkin, regarding his initial psychiatric evaluation
of Charles on July 7, indicated that Charles denied ever having been nervous, suicidal,
depressed, or having any sleep or appetite disturbances prior to his hand injury; that
Claudette had confirmed that his mental problems began with his hand injury; and that
Dr. Glass' diagnosis was that Charles suffered from a "post-traumatic stress disorder."
      Under the heading "POSITIVE AND NEGATIVE ASPECTS OF CASE," Peavy also gave
Pipkin her frank assessment:
Negative aspects of this case include the fact that [Charles] began suffering from
depression and had suicidal ideations shortly after the compensable injury to his hand. Also,
it would appear that [British American] accepted liability for the psychological problems
subsequent to the compensable injury to his hand as [British American] referred [him] to
psychiatrists including Dr. Schack. The fact that [British American] had referred [Charles]
to Dr. Schack poses a problem, as it was Dr. Schack who specifically stated that [Charles']
derangement was caused by the accident which resulted in his suicide.
Speaking from her perspective as British American's counsel, Peavy failed to list anything
"positive" about the case.
      Finally, in a section of her letter devoted to matters meriting further preparation or
investigation, Peavy advised Pipkin that:
      •    British American should obtain an "independent review" of Charles' psychiatric records
from Dr. William Skinner, a psychiatrist whom Linda Raney had recommended; and
      •    Linda Raney, who had spoken to Dr. Jeffrey Glass, believed that he would also attribute
Charles' suicide to the "depression which was caused by the injury to his hand."
Peavy also told Pipkin that, prior to serving written interrogatories on either Dr. Skinner or Dr.
Glass, she would talk to them "to get a feel for their positions," as it would be inadvisable to serve
written interrogatories on a potential witness who would agree with Dr. Schack's opinion that
Charles' mental derangement was attributable to his hand injury.
      Peavy began to prepare for the Benefit Contested Case Hearing even before the BRC hearing
officer had issued a ruling. Rather than obtaining a review of Charles' medical records by Dr.
Skinner, the psychiatrist recommended by Linda Raney, Peavy hired Dr. Clay Griffith, a Dallas
"forensic" psychiatrist, to review the records.


 In Peavy's letter to Dr. Griffith, dated December
2, 1992, she enclosed copies of Charles' medical records—except those from the Whitney
hospital—as well as Linda Raney's records from Excel Rehabilitation Consultants. In connection
with Raney's records, Peavy noted:
The records from Excel provide additional information that will not be found in the medical
records. Such information includes summaries of conversations that Mr. Lewis had with his
wife, a history of marital tension, and that on the day of the suicide, Mrs. Lewis told her
husband that she would leave him if he did not make an attempt to get better.
Peavy also furnished Dr. Griffith a copy of the "relevant provisions" of the Texas Workers'
Compensation Act and "a copy of the Texas case which addresses the compensability of suicides."


 
Peavy also had several phone conversations with Dr. Griffith prior to the Benefit Contested Case
Hearing.
BENEFIT CONTESTED CASE HEARING
      Claudette testified at the Benefit Contested Case Hearing on January 29, 1993, and Peavy
cross-examined her about whether there was "marital tension" in her thirty-five-year marriage to
Charles and whether she had threatened to leave him just before he killed himself. Peavy admitted
at trial that she knew Claudette would be "sensitive" to this type of cross-examination and that it
would be "emotionally painful" for her.


 During Peavy's cross-examination, Claudette became
so upset and distraught that she began crying, and the hearing officer had to recess the proceedings
until she could regain her composure. At Peavy's request, the hearing officer agreed to withhold
a ruling until British American could include a copy of Dr. Griffith's written report in the record.
      Peavy later filed Dr. Griffith's written report with the hearing officer and sent a copy to
Claudette's counsel. Dated March 18, 1993, and written in the form of a letter to Peavy, Dr.
Griffith's report contained the following statements, which we quote at length:
The following is a summary of my review of the medical and personnel records
concerning Charles L. Lewis. These records have provided me with adequate information
to be able to form an opinion concerning whether or not Mr. Lewis' on-the-job injury . . . on
April 16, 1992 is directly related to his suicide on July 25, 1992. . . . 
. . . 
It is my medical opinion that there is no evidence in these records to substantiate the
claim that Charles L. Lewis' on-the-job injury on April 16, 1992 was directly related to his
suicide on July 25, 1992. I found no evidence that he suffered from "an insanity of such
violence as to cause (him) to take his own life through an uncontrollable impulse or in a
delirium of frenzy without conscious volition to produce death......"



The records do, however, indicate that Mr. Lewis was noncompliant with his prescribed
medications even before his on-the-job injury on April 16, 1992, i.e., "Mrs. Lewis did
indicate that Mr. Lewis has a history of high blood pressure but was not taking his medicine
at the time of the injury." This noncompliance with medications and reluctance to treatment
continued on throughout his rehabilitative period.
The records also indicate that Mr. Lewis' family was interfering in his rehabilitation and
well being on a number of occasions. The first time I noted this was on May 30, 1992, when
Ms. Lewis took Mr. Lewis out of the hospital against medical advice even though he was still
at "risk" for committing suicide; she said she "felt" he would be better off recovering at
home. It was also noted in his second hospitalization in June that prior to that hospitalization
his "wife forced him to go to the supermarket with her." Another notation said, "she is angry
at him for his irrational fear of the same type of loss and struggle that has occurred in his
family," and in my opinion there is nothing irrational about this fear.
Linda Raney's reports were extremely revealing to me. I got the distinct impression that
Ms. Lewis lacked sensitivity, compassion, and insight in trying to understand what her
husband was going through. She seemed more concerned about herself and her feelings and
in fact it was stated, "she had become increasingly agitated with the fact that in her opinion,
Mr. Lewis was not trying to get well." Then the day before he committed suicide we learn
that Ms. Lewis was upset when Mr. Lewis asked her not to go to town to take care of
personal errands, which she did every Friday. The final insult, in my opinion, to Mr. Lewis'
emotional well being, or lack of, came the following morning when she (Ms. Lewis) became
angry (once again) and threatened to leave Mr. Lewis (which she had done on other
occasions) if "he did not take charge of his life."
In conclusion, Mr. Lewis' pride or self-worth, as described by one of his physicians,
"was directly related to his ability as a provider," which suddenly came to an abrupt halt when
he injured his hand. Rather than having emotional and physical support, his "family"
suddenly became the authorities on how to best treat and take care of him. They led him here
and there, told him what they thought he should do and how he should do it, they showed
anger and irritation, and then threatened to leave him if he didn't shape up. He was also
angry at his "family" and did verbalize this to one of the health care providers. He then
finally decided on a course of action - suicide, which is the most hostile, final act a person can
commit. I believe that when Ms. Lewis threatened to leave him one more time, and she did
leave, that he deliberately and willfully and consciously took the gun out of the locked? gun
cabinet and put an end to his life.
If more specific details are needed, I will be happy to discuss them with you.
(Emphasis added).
      On April 9, 1993, the Benefit Contested Case Hearing officer, Cheryl Dean, entered her final
order relating to Claudette's claim for death benefits, which included these findings:
      •    "When [Charles Lewis] committed suicide his impulse to commit suicide was one which
arose at a time when he was unable to realistically evaluate such a course of action due
to a mental derangement which impaired his ability to resist";


 and
      •    "This condition, which arose out of the effects of a compensable injury, resulted in a
suicide which was not occasioned by the willful intention . . . to kill himself as
contemplated by the statute."



(Emphasis added). In the order the hearing officer concluded that:
[Charles Lewis'] death is compensable under the Act, and his widow, Claudette Lewis, is his
legal beneficiary, and is entitled to death benefits. . . . [British American] is hereby
ORDERED to initiate death benefits in accordance with this decision and the Texas Workers'
Compensation Act. 
Following the hearing, Claudette demanded that British American furnish her a copy of Dr.
Griffith's report. 
TO PAY OR NOT TO PAY
      On April 29, Peavy wrote Pipkin to summarize the results of the TWCC hearings and to
advise British American of its legal alternatives:
While the Texas Workers' Compensation Act is explicit in its provision [section 3.02(2)]
that willful and intentional injuries are not compensable, the Texas Supreme Court has carved
out a liberal exception to the explicit provisions of the Act. In Saunders v. Texas Employers'
Insurance Association, the Supreme Court held that where the effects of compensable injuries
result in a person becoming dominated by a derangement of the mind which impairs the ability
to resist the impulse to take one's own life to the extent that one is unable to control such an
impulse, a suicide would not be termed as willful under the Workers' Compensation Act. .
. . The Supreme Court stated that the essential question in determining whether or not a
suicide was compensable was whether the record establishes a sufficient mental derangement
causally related to the original injury.



      Peavy then reviewed for Pipkin the facts that "worked in favor of Claudette's position that
[Charles'] psychological deterioration and ultimate suicide were causally related to his
compensable injury":
      •    He had no history of depression or suicidal tendencies prior to the hand injury;
      •    He began to suffer from depression and voice suicidal ideations shortly after the hand
injury;
      •    British American accepted liability for his psychological problems subsequent to the hand
injury by referring him to Dr. Schack, who became his treating physician;
      •    Throughout his treatment, Dr. Schack's opinion was that the hand injury led to the
depression and suicidal tendencies that ultimately resulted in his suicide;
      •    Claudette had the advantage, "with regard to the weight and credibility assigned to the
expert reports and medical records," that Dr. Schack was the treating psychiatrist and
"not merely hired to provide an expert opinion at the Commission level"; and
      •    "[Charles'] behavioral problems prior to and subsequent to his admission to the
psychiatric hospital by Dr. Schack are well documented by the medical records."



      Summarizing her review of the case, Peavy advised Pipkin that:
[T]here appears to be no viable avenues for appeal as the Contested Case Hearing Officer
properly followed the procedural and substantive law applicable in a claim for death benefits
resulting from a suicide. Furthermore, the Contested Case Hearing Officer's decision is
supported by evidence submitted by [Claudette] in this claim. Actually, until Saunders is
overruled, it appears that there is a rather wide avenue for claimants to recover death benefits
resulting from a suicide.



      On May 12, 1993, British American complied with the order entered by the Benefit Contested
Case Hearing officer by paying Claudette's claim for death benefits. This was nine and one-half
months after her husband's death.
THE TRIAL
      On May 13, the day after the company paid her claim, Claudette sued British American for
violating its duty of good faith and fair dealing and article 21.21 of the Texas Insurance Code. 
At trial in May 1994, Claudette called as her first witness Susan Norwood, British American's
designated corporate representative and senior claims representative.


 Although Norwood had
not personally adjusted the claim relating to Charles' hand injury or Claudette's claim for death
benefits, she generally discussed various provisions of the Workers' Compensation Act relating
to the denial of claims and admitted that any adjuster has a duty to reasonably investigate a claim
before denying it and that that duty continues even after denial. This would include, she said,
reviewing information contained in the adjuster's claim file before denial.
      Furthermore, Norwood admitted that her office "primarily" uses a manual, prepared by the
Austin law firm of Flahive, Ogden & Latson, as a ready reference to the provisions of the
Workers' Compensation Act and to its interpretation and application under various circumstances. 
After Claudette produced a 1992 copy of the Flahive-Ogden manual, Norwood searched its index
for the word "suicide" and found not only a reference to, but the following synopsis of, the Texas
Supreme Court's 1975 opinion in Saunders:
This case announces a new standard for suicide cases. If the effect or the treatment of injury
impairs the employee's ability to resist the impulses to take his own life, then suicide could
not be willful infliction of harm, and, hence, it would not come under this exclusion [i.e.,
section 3.02(2)] to compensability.
As for the manual's synopsis of the opinion in Saunders, Norwood admitted that any adjuster
would want to look at and consider its interpretation of the exception in section 3.02(2). Norwood
said that she was not aware that Pipkin had done anything wrong in denying death benefits before
Claudette had ever filed a claim.



      Jim Pipkin, who had twenty-eight years of experience in adjusting workers' compensation
claims, also testified at trial. He admitted to having a "working knowledge" of the Workers'
Compensation Act and that, as an adjuster, he had a duty to make a "reasonable investigation" of
a claim before acting on it. Moreover, he admitted to having approved compensation benefits and
medical expenses related to Charles' hand injury and to having pre-approved his psychiatric
treatment.
      Claudette's counsel questioned Pipkin about the various medical reports and letters that were
contained in British American's claim file on July 28, 1992, the date on which Pipkin denied the
not-yet-filed claim. At the time Pipkin denied the claim, his claim file contained:
      •    A letter from Dr. Gipson to Linda Raney, dated May 11, 1992, advising her that Charles'
depression was "secondary to his hand injury" and that he should be watched for suicide;
      •    Dr. Schack's initial May 7 evaluation in which he reported that Charles had become
"profoundly depressed when his hand was caught by a compressor belt and crushed,
which was quite devastating to him. Since then, he has been extremely depressed and
had been handled with benzodiazephines with minimal improvement";
      •    Linda Raney's letter to Pipkin, dated May 22, 1992, advising him that Dr. Sorokolit, the
surgeon who operated on Charles hand, had told Ruby, Charles' daughter, that her father
"began having symptoms of a major reactive depression" after Dr. Sorokolit told him
that, due to his hand injury, he would "never be able to make a fist again"; and that
Claudette had denied that Charles had any psychiatric problems prior to his hand injury;
      •    Dr. Schack's admission summary, prepared for Charles' first hospitalization for
psychiatric treatment on May 18, 1992, in which he related Charles' depression and
suicidal ideation to his hand injury: "[Charles] likened his life prior to the accident like
traveling down the road and then after the accident occurred feels like he has fallen off
a cliff and `has gone plum down to the bottom of your shoe'";
      •    Dr. Schack's discharge summary, related to Charles' first psychiatric hospitalization,
which also attributed Charles' depression and suicidal ideation to his hand injury; Dr.
Schack also noted that Charles denied ever having any suicidal ideations or psychiatric
hospitalizations prior to the hand injury;
      •    Dr. Schack's admission summary, prepared at the time of Charles' second hospitalization
for psychiatric treatment on June 15, 1992, in which he related Charles' depression,
paranoia, and suicidal ideation to his hand injury and, once again, stated that Charles had
denied having any history of such problems prior to his hand injury; and
      •    Dr. Schack's discharge summary, related to Charles' second psychiatric hospitalization,
in which he also attributed Charles' depression, paranoia, and suicidal ideation to his
hand injury, and noted that Charles denied any history of such problems prior to the hand
injury.
      Pipkin admitted that, between Charles' death on July 25 and the time he denied the claim on
July 28, he did not review any of the medical records in Charles' claim file. Furthermore, he
admitted that he never talked to either Dr. Gipson, Dr. Schack or Dr. Glass before denying the
claim. Yet, Pipkin acknowledged that he had the responsibility "to at least make a reasonable
investigation concerning the facts and circumstances surrounding [Charles'] death." Pipkin
claimed, however, that he had previously reviewed the medical records in the claim
file—presumably, when they were received by him—and that he remembered, "essentially," what
they contained.
      With respect to the information contained in the claim file, Pipkin testified as follows on direct
examination by Claudette's counsel:
      Q   Okay. We can establish, can we not, Mr. Pipkin, that at the time you made the decision
to deny the claim, that there was no medical information contained within the [claim] file
describing Mr. Lewis' depression as being the result of anything other than his injury on
the job?
      A   Not that I recall.
. . . 
      Q   At the time of denial, sir, there was no medical record in your file which indicated that
the doctors held any opinion other than that the depression Mr. Lewis was experiencing
was directly attributable to his on the job injury?
      A   Not that I recall.
. . . 
      Q   Okay. And you will agree, will you not, that as of the date of denial, July 28th, there
was no medical record to support the contrary of the position that Mr. Lewis' depression
was related to the injury?
      A   Correct.
      Q   Okay. Doesn't really matter, though, does it, because you didn't rely on medical records
in making your decision to deny the claim, did you?
      A   Correct.
      Under continued question by Claudette's counsel, Pipkin proceeded to explain his reasons for
denying the not-yet-filed claim for death benefits:
      Q   You made a decision, as I remember your deposition, based upon the one and only fact,
and that was that Mr. Lewis had died because of suicide?
      A   Yes.
      Q   And it was your opinion that all suicides are willful acts?
      A   That is correct.
      Q   And that under no circumstances could this have been a suicide that was not the result of
a willful act?
      A   Correct.
      Q   A personal opinion?
      A   I suppose so.
. . . 
      Q   Okay. At no time did you feel the need, prior to denying this claim, to contact any of
the physicians to ask them about their stated opinions, did you?
      A   Right.
      Q   Okay. At no time did you--did you contact Dr. Schack, Dr. Gipson, or anyone
associated with Willowbrook Hospital?
      A   I don't think so.
. . . 
      Q   . . . . Advise the jury, Mr. Pipkin, if you relied upon any medical records contained
within your possession as of the date of July 28, 1992 in making your decision that Mr.
Lewis' death was [not] related to his job?
      A   No.
      Q   Am I to assume that you did not rely on any medical records in your possession as of that
date?
      A   I don't think so.
      Q   Okay. It's clear, Mr. Pipkin, is it not, that you chose not to rely upon the medical
records, but the fact of the matter is that the medical records, themselves, evidence a
clear causal relationship between Mr. Lewis' injury and his ultimate suicide?
      A   I didn't think so.
. . . 
      Q   It's not your opinion that they don't--that there is not a relationship? There is not a
relationship evidenced in the medical records, even though we have established that the
first record that you received from Dr. Gipson discusses, one, depression secondary to
his injury, and the suicide; correct?
      A   Yes.
      Q   And then two, we have Dr. Schack's records which also describe that Mr. Lewis'
depression and psychiatric problems were related to his injury; correct?
      A   Correct.
      Q   And that as a result of the psychiatric problems, he was susceptible to suicide?
      A   Yes.
. . . 
      Q   I'm asking you, Mr. Pipkin, there is not a single medical record that was in your
possession as of July 28, 1992, the date you denied the claim, that supports your position
that Mr. Lewis' suicide was not related to his injury of April [16,] 1992?
. . . 
      A   Correct.
. . . 
      Q   Now, Mr. Pipkin, . . . you continued to receive medical records after the day that you
made the decision to deny the claim; correct?
      A   That is very possible, yes.
. . .
      Q   Were any of the medical records that you received, as you recall them, of such nature
that it caused you to reconsider or reevaluate your position?
      A   No.
      Q   Okay. Is it true, Mr. Pipkin, that you had already made the decision and you felt like at
that point in time there was no need to continue to consider the medical records as they
came in because in your mind a suicide is not compensable?
      A   Yes.
      Although Pipkin claimed in his deposition that he had never been advised of any "additional
factors" an adjuster should consider before determining whether a suicide constitutes a willful act,
he admitted that Peavy had advised him in her letter following the Benefit Contested Case Hearing
that the Saunders test is a "factor" to be considered. Pipkin acknowledged, in fact, that prior to
denying the claim for death benefits he never conducted any personal investigation of the
circumstances surrounding Charles' suicide. Despite his prior admissions, Pipkin continued to
cling to his opinion that all suicides are non-compensable because they result from willful acts and
that he had conducted a reasonable investigation before denying the claim.
      On cross-examination, Pipkin said that once he learned of Charles' suicide he contacted
Kenneth Stephens' law office and the law firm of Flahive, Ogden & Latson:
      Q   . . . What was the purpose of contacting these lawyers?
      A   The purpose was that I knew I was supposed to suspend temporary income benefits [for
the hand injury], but I wasn't sure what to do about the possible claim for fatal benefits,
and I wanted to get our lawyers' opinion.
      Q   Okay. Do you recall the exact specifics that were discussed with those lawyers?
      A   I can remember one exact specific and that is all.
. . . 
      Q   Mr. Pipkin, what was that one specific you do recall?
      A   It was wording on the--legalese looking wording on Plaintiff's Exhibit 3 [i.e., the TWCC
notice mailed on July 28, 1992, denying the not-yet-filed claim for death benefits].
[Pipkin claimed that he got the "exact wording" from the attorneys he talked to.]
 . . . 
      Q   What was the general content of the conversations you had with these lawyers before you
filed [the notice of] this disputed claim?
      A   The general content was to call the attorneys, explain the situation, the facts as we knew
them at that time, and what I thought that British American's position should be, and did
they agree, or if they did not agree, whichever. That is why I called them.
      Q   And did they disagree?
      A   No, they agreed with our position. In fact, they supported it.
      Q   Did you rely upon this advice of the counsel?
      A   Oh, yes.
      Pamela Peavy, the attorney who represented British American at the TWCC hearings, also
testified at trial. Under direct examination by Claudette's counsel, Peavy acknowledged that Dr.
Clay Griffith, the psychiatrist she hired to render an opinion on Charles' medical records, would
need to know the "correct legal standard" to apply before he could formulate an opinion. As an
explanation of her letter to Dr. Griffith, in which she mentioned Linda Raney's records about
"marital tension" and Claudette's threat to leave Charles shortly before his death, Peavy said that
she was looking at all the events in Charles' life to see if there could be "another independent
reason for his having committed suicide." She at first admitted, and then denied, that in seeking
Dr. Griffith's opinion she was attempting to find some independent event that would "break the
causal connection" between Charles' hand injury and his suicide. 
      Although admitting that the legislature had made no substantive change in section 3.02 from
its predecessor statute, Peavy nevertheless refused to recognize the Saunders test as applicable in
determining whether Charles' suicide was the result of an intentional and willful act.


 Instead,
she essentially claimed that "the black letter law of the statute"—i.e., section 3.02(2)—made all
suicides non-compensable because they always result from an intentional and willful act.
      Peavy testified that both she and Randy Johnson, another attorney in her firm, spoke to Pipkin
at or about the time he was making a decision about denying death benefits. She said that she and
Johnson were both aware of the Saunders opinion when they talked to Pipkin. Peavy never
testified that she or Johnson had ever advised Pipkin to deny the claim.
      Tony Korioth, the general counsel for the Texas Municipal League Intergovernmental Risk
Pool, testified in Claudette's behalf.


 After reviewing British American's claim file, Pipkin's
deposition, and various letters between the company and its attorneys, Korioth said the company
had breached its duty of good faith and fair dealing by denying the claim before it had ever been
filed or investigated and because the company's file contained information that indicated the claim
was clearly compensable under the Saunders test. He discussed the Saunders test and its
continuing applicability in determining whether suicides are compensable under the workers'
compensation law. Korioth, who sets the standards for the adjusters who adjust claims against the
Intergovernmental Risk Pool, found it significant that British American's claim file contained no
evidence or notes indicating that Pipkin had reviewed the file before denying the claim. Korioth
was "bothered," he said, by British American's denial of the not-yet-filed claim for death benefits;
he characterized the company's action in that regard as an obvious "act of intimidation"—i.e.,
British American was trying to keep Claudette from filing a claim with the implicit threat, "If you
dare file a claim, we're going to take you all the way to the ends of the earth."
      Dr. Ricardo Schack also testified at trial, briefly reviewing for the jury Charles' symptoms
and treatment. He confirmed that the facts and circumstances surrounding Charles' emotional
problems established a clear causal connection between his suicide and the prior hand injury, and
that he had no history of psychiatric problems prior to the injury. Dr. Schack explained Charles'
irrational behavior this way:
[His] self-esteem was so hinged on his ability to support his family, that he believed . . . he
had become an embarrassment to his family, and he was so bereaved by this, and so ashamed
of not being able to take care of it, that he developed a depressive condition as a consequence
of having gone through this episode.
Charles' mental derangement, he said, precluded him from resisting the impulse to kill himself.
      Dr. Schack also refuted the comments and opinions in Dr. Griffith's written report concerning
Claudette's lack of sensitivity, compassion, understanding, and insight into her husband's
problems:
      A   [A] more dedicated, loyal wife, I truly have not met. I had the sense that [there] was
nothing that she would not do for her husband. And what makes it sad and sometimes
unspeakably cruel when they do, is that she was more. In many of these things, it's kind
of like when a parent has a child fall off a horse, and, you know, it's very easy, a kid
doesn't want to get back on a horse, and this is part of that. Despite the fact that you're
not sure that what you're doing is right all the time, you make that kid get back on the
horse and ride it again because that is the right thing to do. And that was the distinct
sensation that I had when she would kind of try to push [Charles] at times, and would
push him along and try to get him out of the depression, because I think in her heart she
truly believed that that was the only way he was ever going to get better.
. . . 
      Q   . . . There was an indication by Dr. Griffith that in his mind the final insult was when
Mrs. Lewis did what? What does he say?
      A   That she was going to leave if he "didn't take charge of his life," but it was again like
forcing the kid on the horse. Get off your duff; walk off; we need to get through this. 
I mean, it's no different from people having broken legs or anything, and during
rehabilitation you have to make them do things that they would normally not feel like
doing.
      Q   You said the words "unspeakably cruel" a few moments ago. What are you talking about
there?
      A   For me, and I have to speak very candidly, after you have seen somebody pour so much
energy, so much emotional energy into the welfare of their husband, and to have
somebody take a pot shot from left field, and say that she basically was not a good wife,
was not dedicated, was distant, and that is--you know, that is not only not accurate, but
it is very cruel, because I'm sure that Mrs. Lewis, like anybody would under these
circumstances, would be struggling as to whether she did the right thing or the wrong
thing. None of us have all the answers. You do what you believe is best at that time,
and I believe that Mrs. Lewis was doing what she believed was best for her husband, not
for what she wanted, but what she believed was good for her husband.
. . . 
      Q   . . . Doctor, as a psychiatrist, did . . . Dr. Griffith's report offend you in any way?
      A   I was stunned by it.
      Q   And why were you stunned by it?
      A   Because I found his opinions to be out of line completely with the reality of the case.
      Q   Do you believe . . . the allegations as stated in the [report] of Dr. Griffith . . . would
cause any type of psychological damage to Mrs. Lewis or her family?
      A   I believe them to be inherently cruel.
      Q   How would that cause damage psychologically to the family?
      A   This, in my mind, is a family that is already trying to get over a devastating event. The
leader of a family has killed himself, and now you're in the position where they have a
person in a position of authority, like a physician, pointing the finger specifically at Mrs.
Lewis and saying, it was your fault because you were not a good enough wife; you were
not a supportive enough wife. That I find unbelievable, that somebody could be that
callous and say something of that nature.
      Q   Doctor, . . . I would like for you to assume that Mrs. Lewis was cross-examined by a
representative of [British American] concerning the issue of whether or not on the date
that Mr. Lewis died she threatened to leave him. . . . [D]o you find that type of
questioning to be the type of questioning where it would cause emotional harm to or
damage to Mrs. Lewis?
      A   Yes.
      Q   And can you explain to the jury how you would feel that questioning to be damaging?
      A   It is a very cheap shot to take advantage of somebody's shame and guilt about something
that could have happened of this nature, and it is the kind of doubt that in any person with
a normal conscience would torture you for the rest of your life.
      Claudette described her husband as a person and the nature of their marriage relationship for
the jury:
Charles was a very hardworking man. He was a good man. . . . When anybody needed
him for anything, he was there. He was a good daddy. He was a good husband. He was
the best friend I ever had, and he had a lot of friends in Hillsboro. . . . Charles was the
boss. I did nothing without asking him. We discussed everything, and then he told me
what to do, and I did what he told me to do, and that is the way it was from day one. .
. . Because he was usually right. It was usually right to do what he said to do, so I did
it. . . . [H]is children worshipped the ground he walked on.
Although she said her marriage was "good" and "solid," Claudette admitted that during their
thirty-five years together she had threatened to leave Charles on several occasions. She described
the circumstances that prompted her to actually leave their home in 1959, the only time she had
ever left her husband:
In 1959, I was pregnant with my third child. I was about maybe 18. . . . It was just a
frivolous little argument we had. He made me mad and I went home to mother's. . . .
He pulled up in the driveway the next afternoon. I got the kids and got in the car with
him and we went back home. Nothing was ever said.
      Claudette said she was "shocked" and "devastated" by Peavy's questions at the Benefit
Contested Case Hearing concerning her so-called "marital problems" and her threat to leave
Charles the day before he killed himself. She confirmed that she became so emotional under
Peavy's questioning the hearing officer had to recess the proceeding until she could regain her
composure. She explained her reactions both at and after the hearing this way:
It was embarrassing that she come up and asked me a question like that. It embarrassed me. 
It made me feel very, very embarrassed, very--she made me feel dirty. . . . [She] tried to take
my 35 year marriage and turn it into something that was dirty, that was ugly, which it didn't
happen. We were not having marital problems, and it just made me feel about an inch tall
when she come up with that question. . . . I felt dirty; I felt guilty. I felt like I'd been--I felt
like she'd slandered me and my husband.
According to Claudette, she "cried all the time" for two or three weeks following the hearing.
      Claudette, who demanded and obtained a copy of Dr. Griffith's report after British American
filed it with the hearing officer, commented on the report and her reactions to it:
I thought it was very slanderous. It made me mad. It made me mad that an insurance
company would get a doctor to make a report like that about me with never seeing me, never
seeing Charles, never seeing our family. I was mad, I was embarrassed. . . . The way they
said that in--Dr. Griffith said in his opinion that I pushed Charles into the suicide, just as if
I had pulled the trigger on Charles. He just stopped short of calling me a murderer. He said
my family was getting disgusted with Charles and ashamed of him, and tired of messing with
him, and to me that was very slanderous. . . . There was not one word of truth to that. . . .
It caused me a lot of pain. It caused my children pain. It caused my sister-in-law pain. 
Because we knew how hard we had worked. We knew how much we loved Charles and we
couldn't understand how a doctor could make a report just by reading something on a paper
that someone had sent to them. I couldn't understand how an insurance company could do
that to me or anybody. . . . I'm complaining about the report and I'm complaining about
British America Insurance to do that, to have a doctor make a report like that about someone
that--he didn't know me; he didn't know the situation, except what was on paper. I just felt
like they were slandering me. I felt like they were slandering my family. It was
embarrassing. It made me feel--it made me feel guilty that he would say, just stop short of
saying that I pulled the trigger.
      As for the continuing effects of the Griffith report's allegations, Claudette said they were still
bothering her at the time of trial. On cross-examination, when asked whether she had undergone
any medical or psychiatric treatment for her emotional reactions to Dr. Griffith's report, Claudette
replied that she had just not "given in and gone" for treatment. 
      After the plaintiff rested her case-in-chief, British American presented the testimony of Randy
Johnson and Jack Latson, the two attorneys whom Jim Pipkin claimed he talked with by phone
before mailing the TWCC notice denying death benefits.


 Much of their testimony is the same
on various matters. For example, both said that Pipkin had called seeking advice, and that they
discussed with him the denial of the claim and the wording of the notice of denial. Each admitted
to being familiar with the Saunders test and the Flahive-Ogden workers' compensation manual
when they talked to Pipkin.


 During their testimony, each ventured the opinion that Pipkin, in
denying the claim, had not violated the duty of good faith and fair dealing or committed any unfair
practice under article 21.21 of the Texas Insurance Code. Both admitted that they periodically
represent British American as a client, and Johnson acknowledged that he formerly practiced law
in the same firm as British American's trial counsel.
      Moreover, Johnson and Latson both agreed that the legislature made no substantive changes
from the prior statute when it enacted section 3.02—the statutory exception relied on by British
American in denying the claim. We quote excerpts of their testimony that set forth their respective
views on the applicability of the Saunders test and on the compensability of suicide under the
workers' compensation law, as it existed on the date Pipkin denied death benefits:
JOHNSON'S TESTIMONY
      (On Direct Examination)
      A   Jim [Pipkin] wanted to know whether or not I was in agreement that suicides are not
compensable under the new law, the same as they had been under the old law.
      Q   What did you tell him?
      A   The first time I talked to him I told him my opinion was that they are not compensable. 
Then I talked to him a second time, after I checked the statute [section 3.02], and had
also talked to Jack Latson about it, and again told him that, in my opinion, suicides are
not compensable under the new law.
      (On Cross-Examination)
      Q   What I'm saying is that, assuming that [section 3.02] is the same law as the old law. 
Okay? Worded the same. And assuming that there are cases, say, the Supreme Court
of Texas has considered, interpreting the very same provision. Okay? You would want
to be able to advise your client concerning how the Supreme Court had interpreted that
provision?
      A   Depending on the situation, that is something I would take into account in responding to
whatever question they might have, yes.
      Q   Well, what if [the Supreme Court] discussed the fact of whether or not suicides were the
type of death which could or could not be considered compensable under the Act?
      A   Counsel, I think I know where you're going with this, and your inference is that Saunders
says that suicides are compensable, and Saunders does not hold that suicides are
compensable. And regardless of what is stated in Saunders, based on the facts that were
given to me by Jim Pipkin, in light of Saunders and its interpretation of that language,
my opinion was and still is that suicides are not compensable.
      Q   Okay.
      A   Saunders talks about a situation [where] you don't have an intentional taking of [one's
life], and that takes it out of the definition of suicide. Suicide by definition is an
intentional taking of [one's] own life. That particular incident, suicide, . . . intentional
taking of [one's own] life, in my opinion, is not compensable under the old law or new
law.
. . .
      A   I'm telling you that when you deal with a suicide, the black letter law, the statute,
[section] 3.02(2), it says that suicides are not compensable. And Saunders establishes an
exception, a very narrow exception, but it's dealing with a situation where you're not
really dealing with a suicide any more, you're dealing with someone who, because of
their situation, is not acting with willful intention. If you have a suicide, then you have
a willful intention. If you have a willful intention, it's not compensable under the Act.
      (On Redirect Examination)
      Q   All right. [Mrs. Lewis' counsel] asked you about whether you had all this information
[in British American's claim file] in front of you when you gave your initial opinion to
Mr. Pipkin on the telephone. You remember him asking you about that?
      A   I do.
      Q   Once the file came [to your law office] a couple of days later, did that change your
opinion?
      A   It did not.
LATSON'S TESTIMONY
      (On Direct Examination)
      Q   And are you aware that [Mrs. Lewis' counsel] has hired Tony Korioth to be an expert
witness and give some opinions in this case?
      A   Yes, sir.
. . . 
      Q   . . . Did Mr. Korioth provide you information to review on this particular case?
      A   Yes. When you hired me, I called Tony up and asked if it would be okay if I came over
to his office and got his file that he had been provided by [Mrs. Lewis' counsel].
. . .
      Q   Mr. Latson, do you have an opinion as to whether this case fits the Saunders test?
. . .
      A   [My] opinion is it does not fit the Saunders test, and that the suicide was willful and is
not covered by the Workers' Comp Act.
      Q   Now, in most suicides, and in particular this one, do you have an opinion as to whether
that is something that is a willful intention and attempt to injure oneself?
. . .
      A   By definition, a suicide is something that someone intends. It's a choice that the person
makes. I think Mr. Lewis had a choice not to commit suicide or to commit suicide. I
think he exercised the choice to kill himself.
      (On Cross-Examination)
      Q   What I'm saying is, the general rule is that no suicides are compensable?
      A   That's correct.
      Q   But that is the issue with regard to willful and intentional suicide; correct?
      A   That's correct. And I am of the opinion that all suicides are willful. I cannot feature a
circumstance in which an intention to cause oneself harm is not the result of choice.
THE VERDICT
      The jury found that British American intentionally breached the common-law duty of good
faith and fair dealing and knowingly engaged in unfair or deceptive acts or practices prohibited
by article 21.21 of the Texas Insurance Code. It awarded Claudette $125,000 for past mental
anguish, $125,000 for future mental anguish, and reasonable attorney's fees equal to twenty
percent of her recovery. However, the jury failed to award her any exemplary damages in the
bifurcated portion of the proceeding.



THE JUDGMENT
      After Claudette elected to recover based on a knowing violation of article 21.21, the court
rendered a judgment against British American for $250,000 actual damages, $500,000 additional
damages, $150,000 attorney's fees, and $64,520.55 prejudgment interest.
MOOT POINTS
      British American has assigned points of error attacking the findings relating to the intentional
breach of the duty of good faith and fair dealing, a theory of recovery on which the judgment does
not rest. All of these points are moot because they cannot serve as a basis for reversing the
judgment. Ponton v. Munro, 818 S.W.2d 865, 867 (Tex. App.—Corpus Christi 1991, no writ). 
We therefore overrule, without discussion, points one through three, seven-A,


 and twelve.
UNFAIR OR DECEPTIVE ACTS OR PRACTICES
      The jury answered "yes" to the following questions:
      QUESTION NO. 3:
Did BRITISH AMERICAN INSURANCE COMPANY engage in any unfair or deceptive
act or practice that resulted in damages to CLAUDETTE LEWIS?
"Unfair or deceptive act or practice" means any of the following:
            1.   Engaging in any false, misleading, or deceptive acts or practices.
"False, misleading, or deceptive acts or practices" means an act or series of acts that
have the tendency to deceive an average, ordinary person, even though that person
may have been ignorant, unthinking, or gullible; or,
            2.   Making directly or indirectly causing to be made, any assertion, representation, or
statement with respect to insurance that was untrue, deceptive, or misleading; or,
            3.   Making any misrepresentation relating to insurance.
"Misrepresentation" means any of the following:
                  a.   any untrue statement of a material fact; or,
                  b.   any failure to state a material fact that is being misleading, when these
statements are considered in the light of the circumstances under which they are
made; or,
                  c.   the making of any statement in such manner or order as to mislead a reasonably
prudent person to a false conclusion of a material fact.
            4.   Not attempting in good faith to effectuate a prompt, fair, and equitable settlement of
a claim when liability has become reasonably clear; or,
            5.   Failing to process a claim in good faith; or,
            6.   Failing to adopt and implement reasonable standards for prompt investigation of
claims arising under its policy.
            7.   Failing to properly and equitably pay a claim when liability becomes reasonably
clear.
QUESTION NO. 4:
Did BRITISH AMERICAN INSURANCE COMPANY knowingly commit any of the
conduct that you have found resulted in damages to CLAUDETTE LEWIS in your answer
to Question No. 3?
            In answering this question, consider only the conduct that you have found resulted in the
damages to CLAUDETTE LEWIS. 
EVIDENTIARY POINTS
      British American attacks both the legal and factual sufficiency of the evidence supporting the
affirmative answers to Questions 3 and 4.


 The factual-sufficiency complaints, points eight and
eleven, were preserved in a motion for a new trial. Points four through seven and points nine and
ten encompass the no-evidence complaints, which were preserved by objections to the charge and
in the motion for judgment notwithstanding the verdict.
      British American made only two distinct no-evidence objections to the submission of Question
3: (1) there is no evidence of any unfair or deceptive acts or practices, and (2) there is no evidence
of a breach of the duty of good faith and fair dealing and, for that reason, Claudette cannot recover
on her statutory claims as a matter of law. However, in its argument under the combined no-evidence points, British American also attacks Question 3 and the accompanying definition of
"unfair or deceptive act or practice" on the following grounds:
      •    The global submission of Question 3 requires a remand because one cannot identify and
"discuss the theory followed by the jury in reaching its answer";
      •    Subparts (1) through (3) of the definition do not define acts or practices as required by
section 16 of article 21.21 and thus will not support a recovery; and
      •    Subparts (4) through (7) of the definition list acts or practices that "are not actionable as
a private cause of action."
None of these complaints were included in the objections to the charge or in the motion for
judgment notwithstanding the verdict. Thus, they have been waived and will not be considered
on appeal. Tex. R. Civ. P. 274; Allen v. American National Insurance Company, 380 S.W.2d
604, 608-09 (Tex. 1964).
      The charge placed the parties on notice that the jury's answers to the questions, as actually
submitted, would form the basis of any judgment to be rendered. Allen, 380 S.W.2d at 609. 
Therefore, we will measure the legal and factual sufficiency of the evidence against the charge
actually given. Southern Life & Life Ins. Co. v. Alfaro, 875 S.W.2d 740, 744 (Tex. App.—San
Antonio 1994, no writ) (on rehearing). To hold otherwise would abrogate the waiver provision
of Rule 274. Id.
      Point four alleges that the court erred when it denied British American's motion for an
instructed verdict at the close of the plaintiff's case-in-chief. This complaint was waived when
British American elected not to stand on the motion but, instead, presented evidence. Star
Houston, Inc. v. Shevack, 886 S.W.2d 414, 417 n.2 (Tex. App.—Houston [1st Dist.] 1994), writ
denied per curiam, 907 S.W.2d 452 (Tex. 1995). Point four is overruled.
      British American contends in point seven that the court erred when it overruled a special
exception to the pleading of Claudette's statutory claims. Although the court held a pretrial
hearing on special exceptions, the record reflects that at the hearing British American essentially
withdrew its special exception to the pleading of Claudette's statutory claim. The record also
reflects that Claudette amended her petition following the hearing without British American ever
re-urging its special exception. Clearly, British American never obtained an adverse ruling on its
exception. Under the circumstances, it waived any complaint about a pleading defect relating to
the statutory claims. Tex. R. Civ. P. 90, 91; Roark v. Allen, 633 S.W.2d 804, 810 (Tex. 1982). 
Point seven is overruled.
      On July 28, 1992, Jim Pipkin affirmatively represented to the Texas Workers' Compensation
Commission and to Claudette, who received a copy of the notice of denial, that Charles' death was
"not related to his job"—i.e., his death was not causally connected to his hand injury. Yet, the
evidence is undisputed that at the time of denial British American had absolutely no evidence to
substantiate such a representation. Not only did British American's claim file contain
overwhelming evidence that Charles' treating physicians and psychiatrists attributed his depression
and predisposition to suicide to his hand injury, but the company's own actions recognized that
causal relationship. Pipkin, who pre-approved and authorized payment for Charles' psychiatric
treatment as secondary to his hand injury, readily admitted at trial that, "as of the date of denial,
July 28th, there was no medical record to support the contrary of the position that Mr. Lewis'
depression was related to the [hand] injury." The jury could have reasonably found from the
evidence that British American's unsubstantiated affirmative representation, that Charles' death
was not causally connected to his hand injury, was false and misleading and made knowingly in
an attempt to deceive. Thus, the evidence is both legally and factually sufficient to support a
finding that British American knowingly engaged in unfair or deceptive acts or practices, as
defined in sections 1 and 2 of the definition accompanying Question 3.
      Moreover, the jury could have reasonably found from the evidence that British American's
unsubstantiated representation was a knowing misrepresentation relating to insurance. 
Accordingly, the evidence is both legally and factually sufficient to support a finding that British
American knowingly engaged in unfair or deceptive acts or practices, as defined in subsections
3(a) and 3(c) of the definition accompanying Question 3.
      The record contains ample evidence from which the jury could have also reasonably found
that British American failed to make a good-faith attempt to effectuate a prompt, fair, and
equitable settlement after its liability became reasonably clear. We do not address the points
attacking the legal and factual sufficiency of the evidence supporting the findings of an intentional
violation of the common-law duty of good faith and fair dealing because the judgment is not based
on those findings. However, section 4 of the definition accompanying Question 3 provides that
"[u]nfair or deceptive act or practice" includes "[n]ot attempting in good faith to effectuate a
prompt, fair, and equitable settlement of a claim when liability has become reasonably clear." 
(Emphasis added). In reviewing the good-faith component of section 4, we nevertheless will apply
the Aranda test: (1) whether British American had a reasonable basis for denying or delaying
payment of the claim; and (2) whether British American knew or should have known that it had
no reasonable basis for denying or delaying payment. Aranda v. Insurance Co. of North America,
748 S.W.2d 210, 213 (Tex. 1988).
      British American contends that it acted in good faith in originally denying the claim and then
persisting in the denial. First, it essentially argues that the facts surrounding the suicide provided
a reasonable basis for disputing its liability. Second, British American claims it acted in good faith
in disputing liability because it relied on the advice of its legal counsel. In analyzing British
American's contentions of good faith, we start with the basic premise that the jury, as fact-finder,
could assess the witnesses' credibility and elect to believe all, none, or only part of their
testimony. Lockley v. Page, 142 Tex. 594, 180 S.W.2d 616, 618 (1944).
      Pipkin admitted at trial that, before denying the claim, he never investigated the circumstances
surrounding Charles' death or even reviewed the evidence in his claim file. He also admitted that
the claim file contained absolutely no evidence that would support the denial and that, in fact, all
of the medical reports in the file attributed Charles' depression and suicidal tendencies to his hand
injury. Peavy's letter of November 30 not only confirmed the lack of supporting evidence at the
time of denial but effectively placed British American on notice—four months after denial—that
its action was still unsupported by any evidence. Evidence that "the insurer unreasonably
disregards the evidence of coverage" will support a finding that no reasonable basis existed to deny
or delay payment. Lyons v. Millers Cas. Ins. Co. of Texas, 866 S.W.2d 597, 601 (Tex. 1993).
      Before addressing British American's second contention—that it acted in good faith because
it relied on the advice of its legal counsel—we note that there can be no reasonable legal dispute
over whether the Saunders test was applicable in interpreting section 3.02 at the time of Charles'
death. When the legislature reenacts a statutory provision without any material or substantive
change from the prior law, a presumption arises that the legislature knew and adopted the
interpretation placed on the prior act by the courts and intended the new provision to be interpreted
accordingly. First Employees Ins. Co. v. Skinner, 646 S.W.2d 170, 172 (Tex. 1983). Clearly,
the legislature made no substantive change in the prior law when it enacted section 3.02 as part
of the 1991 version of the Workers' Compensation Act; Johnson, Latson, and Peavy—British
American's counsel—admitted as much at trial. Thus, a legal presumption arose at the time of
section 3.02's enactment that the legislature knew of the Saunders decision and intended to adopt
and apply its interpretation of the prior statute to section 3.02(2). Id.
      Furthermore, British American is charged with the knowledge of a reasonable insurance
carrier that markets workers' compensation policies. Jim Pipkin, who at the time was the senior
claim adjuster for British American and its vice-president of workers' compensation claims, was
likewise charged with the knowledge of a reasonable claim adjuster commensurate with his twenty-eight years of experience and employment status. Being charged with the reasonable knowledge
of the law, no insurance carrier or claim adjuster of Pipkin's status and experience could
reasonably feign ignorance of the Saunders test and its application to section 3.02. Indeed, the
1992 Flahive-Ogden manual, which the evidence shows is apparently "THE" manual for Texas
workers' compensation insurance carriers and their adjusters, effectively precludes any reasonable
argument to the contrary. Thus, Pipkin's "personal opinion" that all suicides are non-compensable
under section 3.02, because they result from an intentional act on the part of the victim to take his
own life, could not provide a reasonable basis for denying or delaying payment of death benefits. 
Furthermore, Pipkin and British American should have known that his personal opinion provided
no reasonable basis for denial or delay. Nor will Pipkin's personal opinion support a claim that
he and the company acted in good faith when it failed to attempt to effectuate a prompt, fair, and
equitable settlement after its liability became reasonably clear, either at the time of denial or after
he received Peavy's November 30 letter.
      Pipkin testified, however, that before denying the claim he contacted British American's legal
counsel, explained the facts, and that they agreed the claim should be denied. He could remember
only "one exact specific" of his conversations with the attorneys, and that was the "legalese
looking" wording of the notice of denial. He said that he got the "exact wording" of the denial
from the attorneys. In fact, the only personal note Pipkin placed in the claim file after talking to
counsel corresponds exactly to the wording he used in the notice of denial. Significantly, his
personal note does not contain any indication that the attorneys advised him to deny the claim. 
Consequently, the jury could have elected to believe Pipkin's assertion that he contacted counsel
to obtain the "exact wording" of the denial, which is supported by his personal note in the claim
file, but reasonably discarded his unsupported claim that he had consulted the attorneys on the
claim's merits, explained the facts known by him at that time, and relied on their legal advice in
denying it. Although Peavy, Johnson, and Latson offered support for Pipkin's actions at trial,
they never explicitly testified that they advised him to deny the claim. Accordingly, the jury could
have reasonably rejected Pipkin's assertion that the attorneys agreed with his action in denying the
claim and that he acted and relied on their advice in doing so. Furthermore, assuming that Peavy,
Johnson, and Latson advised Pipkin to deny the claim based on the "black letter" language of
section 3.02(2), without regard to the Saunders test, neither Pipkin nor British American could
have reasonably relied on such patently incorrect legal advice. 
      Nor was the jury required to believe the testimony of Peavy, Johnson, and Latson. Their law
firms regularly represented British American on an on-going basis, and Peavy had actually
represented the company in the two TWCC hearings. In judging their credibility and weighing
the evidence, the jury was entitled to assay their testimony for possible bias and self-interest. 
Lockley, 180 S.W.2d at 618. Moreover, Pipkin's admissions could have cast serious doubt on the
attorneys' credibility and impartiality, especially on their assertions that Pipkin had explained the
facts relating to the claim during their phone conversations. Pipkin admitted, as already noted,
that he did not examine the claim file or investigate the circumstances surrounding Charles' suicide
before denying the claim. Consequently, the jury could have reasonably rejected Pipkin's
assertion that he had explained to the attorneys the facts "as we knew them at that time." Contrary
to the testimony of Johnson and Latson, the jury could have reasonably believed that Pipkin was
unaware of any facts surrounding the suicide and thus did not give the attorneys any factual
background concerning the merits of the claim. Instead, the jury could have reasonably believed
that Pipkin decided to deny the claim, without regard to the facts or circumstances, and consulted
the attorneys solely on the wording of the notice of denial—the "one exact specific" he could recall
of his discussions with the attorneys.
      In summary, the jury could have reasonably believed and found from the evidence that: (1)
Pipkin unreasonably disregarded evidence of coverage in denying the claim and persisting in its
denial; (2) Pipkin did not solicit or rely on the advice of British American's legal counsel in
denying the claim and persisting in its denial; (3) British American's liability was reasonably clear
at the time of denial and after it received Peavy's November 30 letter; and (4) British American
had no reasonable basis, and knew or should have known that it had no reasonable basis, for
denying the claim or persisting in its denial after it received Peavy's November 30 letter.
      Thus, the evidence is both legally and factually sufficient to support a finding that British
American acted in bad faith when it failed to attempt to effectuate a prompt, fair, and equitable
settlement of the claim after its liability became reasonably clear, as defined in section 4 of the
definition accompanying Question 3. 
      Based on the evidence, the jury could have also reasonably believed and found that British
American had failed to process the claim in good faith. As we have noted, the jury could have
reasonably found that Pipkin unreasonably disregarded evidence of coverage and denied the not-yet-filed claim without any investigation or regard for the facts. This, alone, would support a
finding that British American failed to process the claim in good faith. Furthermore, the jury
could have reasonably believed and found that British American attempted to intimidate Claudette
into not pursuing her claim for death benefits by denying the claim before it was ever filed. Tony
Korioth, an expert with broad and varied experience in the field of workers' compensation law and
insurance, characterized the company's precipitous denial of the non-existent claim as an obvious
"act of intimidation," carrying with it the implicit threat, "If you dare file a claim, we're going
to take you all the way to the ends of the earth." Moreover, Peavy had access to Dr. Glass'
August 6, 1992, letter in which he advised Pipkin that Charles' family was struggling with feelings
of "guilt and neglect" and that Claudette, in particular, "feels very guilty" that she may have
provoked her husband's suicide. Considering this fact, the jury could have reasonably believed
and found that Peavy purposefully cross-examined Claudette about her threat to leave Charles on
the day before his death as another act of intimidation, i.e., by deepening her sense of guilt, she
might forego pursuing her claim in a public trial after conclusion of the TWCC hearings. 
Likewise, the jury could have reasonably believed and found that Peavy had used Dr. Griffith's
report for the purpose of deepening Claudette's sense of guilt and humiliation in furtherance of
the intimidation.
      Thus, the evidence is both legally and factually sufficient to support a finding that British
American failed to process the claim in good faith, as defined in section 5 of the definition
accompanying Question 3. 
      For the reasons previously stated in connection with section 4 of the definition, the evidence
is both legally and factually sufficient to support a finding that British American failed "to adopt
and implement reasonable standards for prompt investigation of claims arising under its policy"
and "to properly and equitably pay a claim when liability becomes reasonably clear," as defined
in sections 6 and 7 of the definition accompanying Question 3.
      Consequently, the evidence is both legally and factually sufficient to support findings that
British American engaged in unfair or deceptive acts or practices (Question 3) and that it did so
knowingly (Question 4). We thus overrule evidentiary points five and six and eight through
eleven.
MENTAL ANGUISH
      Points thirteen through eighteen


 attack the legal and factual sufficiency of the evidence to
support findings that Claudette suffered $125,000 in past mental anguish and $125,000 in future
mental anguish. In connection with the damage question, the court defined "mental anguish" as
"emotional pain, torment, and suffering. It is more than ordinary annoyance, embarrassment, or
anger." Under this definition, Claudette had to demonstrate something more than mere worry,
anxiety, vexation, embarrassment, or anger; in fact, mental anguish requires a "high degree of
mental suffering and an intense pain of body or mind." First Title Co. of Waco v. Garrett, 802
S.W.2d 254, 260 (Tex. App.—Waco 1990), reversed on other grounds, 860 S.W.2d 74 (Tex.
1993). British American argues under its combined points that the evidence is both legally and
factually insufficient to support an award of past or future mental anguish and that, even if the
evidence is sufficient, the amount of damages awarded is so excessive as to require a remittitur.



      First, as for the complaint that the award of past and future mental anguish is excessive, the
law provides no precise legal measure for such a recovery.


 Necessarily, then, the responsibility
for determining the amount to be awarded was within the jury's discretion. Wells v. Henderson,
78 S.W.2d 683, 687 (Tex. Civ. App.—Beaumont 1935, writ ref'd). Because there is no evidence
that the jury acted out of passion, prejudice or other improper motive, the amounts awarded for
past and future mental anguish will not be set aside or remitted as excessive. Id.
      With regard to the evidentiary support for an award of past and future mental anguish, British
American contends the evidence shows nothing more than that Claudette suffered from "mere
worry, anxiety, vexation, embarrassment, or anger," and that she has thus failed to demonstrate
the requisite "high degree of mental suffering and an intense pain of body or mind." Garrett, 802
S.W.2d at 260. However, the record contains evidence that her mental distress entered the realm
of suffering required to sustain a recovery for mental anguish.
      Claudette characterized the allegations in the Griffith report as "just stopping short of calling
her a murderer." The jury could have reasonably interpreted them in that same vein. Thus, the
jury could have reasonably believed and found from the evidence that an allegation essentially
charging Claudette with murdering her husband, or a least with complicity in his death, was
particularly damaging to her psychologically. Dr. Schack, in fact, described the report's
innuendoes—if not explicit allegations—that Claudette was responsible for her husband's death as
the type of charges that would "torture" her for the rest of her life. He believed the allegations
in the report were the type that would cause her "emotional harm and damage." That Claudette
was struggling with deep emotional pain is established by Dr. Glass' memorandum of August 6,
1992, which summarized a meeting with Claudette and other family members within a week after
Charles' death, and by Pipkin's approval of the family's psychiatric consultation with Dr. Glass. 
In his memorandum, Dr. Glass describes family members as being "extremely distraught." As
for the outward manifestation of her intense emotional pain, Claudette said that she "cried all the
time" for two or three weeks following the Benefit Contested Case Hearing, where Peavy had
cross-examined her about marital strife and her threat to leave Charles the day before he
committed suicide. Although Peavy's cross-examination obviously upset Claudette, the record
shows that Dr. Griffith's allegations of insensitivity, selfishness, and complicity in her husband's
death are what produced her high degree of emotional pain and mental torment. Thus, the
evidence is legally and factually sufficient to show that Claudette suffered something more than
insignificant or ordinary worry, anxiety, vexation, embarrassment or anger, but suffered from a
"high degree of mental suffering and an intense pain of body or mind." Garrett, 802 S.W.2d at
260. 
      There is no evidence that Claudette even knew of the Griffith report's existence until after
April 9, 1993, the date the Benefit Contested Case Hearing officer entered her final order. 
Clearly, she did not obtain a copy of the report until sometime after the final order was entered. 
Her emotional reactions to the report's allegations are set forth earlier in the opinion. Moreover,
she claimed still to be haunted by the allegations at the time of trial, more than a year after Dr.
Griffith prepared the report. Based upon Dr. Schack's opinion testimony, the manner and means
of Charles' death, Claudette's testimony, and the nature of the allegations essentially charging
Claudette with complicity in her husband's death, the evidence is legally sufficient to support a
finding that Claudette suffered past mental anguish and would continue to do so in the future. 
Moreover, considering the evidence as a whole, it is factually sufficient to support an award of
past and future mental anguish. Points thirteen through eighteen are overruled.
CONSTITUTIONALITY OF ADDITIONAL DAMAGES
      British American contends in point nineteen that section 16(b)(1) of article 21.21 of the
Insurance Code, which required the court to award additional damages after the jury found a
knowing violation of article 21.21, is facially unconstitutional.


 Act of March 19, 1985, 69th
Leg., R.S., ch. 22, § 3, 1985 Tex. Gen. Laws 395, amended by Act of May 19, 1995, 74th Leg.,
R.S., ch. 414, § 13, 1995 Tex. Gen. Laws 2988, 3000. The crux of its argument is that the
provision ignores and circumvents the requirements of Transportation Ins. Co. v. Moriel, 879
S.W.2d 10 (Tex. 1994), by arbitrarily requiring the court to set the amount of additional damages
at twice the amount of actual damages. By avoiding the requirements of Moriel, British American
says, the Texas Legislature has violated federal and state constitutional guarantees of due process,
due course of law, trial by jury, freedom from excessive fines and penalties, as well as the "open
courts" provision of the state constitution.
      What is at issue is the right of the legislature to enact a penalty provision for knowingly
engaging in unfair or deceptive acts or practices proscribed by the Texas Insurance Code. The
legislature predetermined, in this instance, that the penalty shall be twice the amount of actual
damages.
      We start our analysis with the presumption that the penalty provision is constitutional, i.e.,
the legislature acted within its powers and did not act unreasonably or arbitrarily. Texas Workers'
Compensation Com'n v. Garcia, 893 S.W.2d 504, 520 (Tex. 1995) (citing Smith v. Davis, 426
S.W.2d 827, 831 (Tex. 1968)). Likewise, we begin with the premise that the state's police power
grants it the authority "to promote the public convenience or the general prosperity, as well as
regulations designed to promote the public health, the public morals, or the public safety." City
of Round Rock v. Smith, 687 S.W.2d 300, 302 (Tex. 1985) (citing Lombardo v. City of Dallas,
124 Tex. 1, 73 S.W.2d 475, 479 (1934)). This power extends to declaring what shall be public
policy in insurance matters. Castillo v. Canales, 141 Tex. 479, 174 S.W.2d 251, 253 (1943). 
Acting under its police power, the legislature enacted article 21.21 of the Insurance Code for the
express purpose of prohibiting unfair or deceptive acts or practices in the business of insurance. 
Tex. Ins. Code Ann. art. 21.21, § 1 (Vernon Supp. 1996). One of the remedies the legislature
chose for protecting the public interest was to mandate a penalty against any person who
knowingly engages in such prohibited practices. Id. art. 21.21, § 16(b)(1). The legislature
established the formula for calculating the amount of the penalty at twice the amount of actual
damages determined by the fact-finder. Id.
      The legislature has broad discretion in determining not only what the public interest requires
but what measures are necessary for its protection. State v. Richards, 157 Tex. 166, 301 S.W.2d
597, 602 (1957). "If there is room for a fair difference of opinion as to the necessity and
reasonableness of a legislative enactment on a subject which lies within the domain of the police
power, the courts will not hold it void." Id. The penalty provision bears a rational relationship
to a legitimate state interest and thus meets federal due-process requirements.


 See Ferguson v.
Skrupa, 372 U.S. 726, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93 (1963); State Farm Fire and Cas. Co.
v. Price, 845 S.W.2d 427, 440 (Tex. App.—Amarillo 1992, writ dism'd by agreem't). It also
meets our state's constitutional guarantee of due course of law


 because "there is room for a fair
difference of opinion as to the necessity and reasonableness" of the enactment in protecting the
public interest.


 Richards, 301 S.W.2d at 602. In any event, the state's police power may even
override certain fundamental liberties, such as due process, when the enactment is narrowly and
precisely drawn and is reasonably necessary to secure the health, safety, or general welfare of the
public. Barbier v. Connolly, 113 U.S. 27, 5 S.Ct. 357, 359, 28 L.Ed. 923 (1884); City of New
Braunfels v. Waldschmidt, 109 Tex. 302, 207 S.W. 303, 305 (1918).
      British American insists that the penalty provision violates its constitutional right to a jury
trial


 because the court, rather than the jury, arbitrarily determines the amount of penalty to be
assessed. This contention misconstrues the legislative scheme inherent in the provision. First,
the fact-finder must find not only the amount of any actual damages but also find a knowing
violation of article 21.21. Tex. Ins. Code Ann. 21.21, § 16(b)(1). Only then can the amount
of the penalty be calculated and assessed by the court. Id. In reality, then, the jury's findings also
establish the amount of penalty as a matter of law. When viewed in this light, the right to a jury
trial is satisfied and preserved because the defendant is afforded access to a jury for the
determination of disputed fact issues affecting liability for both actual damages and the additional
penalty. Garcia, 893 S.W.2d at 527-28 (citing Middleton v. Texas Power & Light Co., 108 Tex.
96, 185 S.W. 556, 562 (1916)).
      Moreover, the legislature has the constitutional authority, subject to guarantees of open courts
and due process, to define the parameters of a cause of action, and issues not relevant to the cause
of action defined need not be submitted to a jury. Garcia, 893 S.W.2d at 528. Here, the
legislature has established a statutory cause of action for unfair or deceptive trade practices in
insurance matters and preserved British American's right to a jury trial on the basic cause of
action; under the legislative scheme, however, there is no fact issue for the jury to determine with
respect to the amount of the penalty, which is a simple mathematical calculation by the court based
on the jury's findings of a knowing violation and actual damages. Thus, the penalty provision
does not violate the right to a trial by jury.
      Likewise, there is no merit to the claim that the penalty provision violates Texas' open-courts
guarantee.


 The test applied to this particular constitutional provision is as follows:
[L]egislative action withdrawing common law remedies for well established common law
causes of action . . . is sustained only when it is reasonable in substituting other remedies, or
when it is a reasonable exercise of the police power in the interest of the general welfare.
Id. at 520 (quoting Trinity River Auth. v. URS Consultants, 889 S.W.2d 259, 262 (Tex. 1994)). 
As noted above, the legislature clearly acted within its police power in enacting article 21.21,
including the penalty provision for a knowing violation. Richards, 301 S.W.2d at 602.
      British American's complaint that the penalty assessed violates the constitutional provision
prohibiting excessive fines and penalties


 is also meritless. Under the statutory scheme, the
greater the actual damages proximately caused by the unfair or deceptive act or practice, the
greater the penalty for knowingly engaging in such act or practice—and vice versa. The
legislature's proportionment of the penalty at twice the amount of actual damages is neither
unreasonable nor so onerous that it constitutes an excessive fine or penalty. Price, 845 S.W.2d
at 440.
      As for the contention that the penalty provision circumvents the standards in Moriel, we note
in passing that those standards are designed to assure due process in the assessment of penalties
by a jury. See Moriel, 879 S.W.2d at 16-17. As already noted, the legislature in exercising its
police power is presumed to have acted rationally, reasonably, and with due regard for
constitutional principles. Garcia, 893 S.W.2d at 520. British American has not shown that it
acted otherwise.
      For all of these reasons, we overrule point nineteen.
PREJUDGMENT INTEREST
      British American complains in point twenty that the court erred when it calculated
prejudgment interest. In a motion to modify the judgment, it contended that Claudette was only
entitled to prejudgment interest on actual damages, not on additional damages. Because this was
the only complaint presented to the trial court, other arguments British American raises in point
twenty have not been preserved for our review. Tex. R. App. P. 52(a); Young, 682 S.W.2d at
237.
       We conclude that the court acted properly when it awarded prejudgment interest on both
actual and additional damages under the authority of C & H Nationwide, Inc. v. Thompson, 903
S.W.2d 315 (Tex. 1994), and Ellis County State Bank v. Keever, 888 S.W.2d 790 (Tex. 1994). 
The Supreme Court had held earlier in Vail v. Texas Farm Bureau Mut. Ins. Co., 754 S.W.2d
129, 137 (Tex. 1988), that a court could not award prejudgment interest on the penalty assessed
in a suit under article 21.21. It based the holding in Vail on its prior decision in Cavnar v. Quality
Control Parking, Inc., 696 S.W.2d 549, 555 (Tex. 1985) (holding that prejudgment interest may
not be awarded on punitive damages). However, the legislature enacted section 6(a) of article
5069-1.05, which states: 
Except as provided by Subsections (b), (c), and (d) of this section, prejudgment interest
accrues on the amount of the judgment during the period beginning on the 180th day after the
date the defendant receives written notice of a claim or on the day the suit is filed, whichever
occurs first, and ending on the day preceding the date judgment is rendered.
Tex. Rev. Civ. Stat. Ann. art. 5069-1.05, § 6(a) (Vernon Supp. 1996) (emphasis added).
      Section 6(a) modified the holding in Cavnar so as to allow prejudgment interest on future
damages. Thompson, 903 S.W.2d at 324. Nevertheless, section 41.006 of the Texas Civil
Practice and Remedies Code provided that "[p]rejudgment interest may not be assessed or
recovered on an award of exemplary damages." Tex. Civ. Prac. & Rem. Code Ann. § 41.006
(Vernon Supp. 1994).


 Section 41.006 limited section 6(a) of article 5069-1.05. Keever, 888
S.W.2d at 797. Thus, in all actions to which section 41.006 applied, prejudgment interest could
not be recovered on punitive damages. Id. The legislature, however, has expressly exempted all
actions brought under article 21.21 of the Insurance Code from the application of chapter 41 of
the Civil Practices and Remedies Code, which included section 41.006. Tex. Civ. Prac. & Rem.
Code Ann. § 41.002(b)(2) (Vernon Supp. 1996). Because section 41.006 was clearly inapplicable
to Claudette's action, the provisions of section 6(a) of article 5069-1.05 were unaffected, and the
court thus properly awarded prejudgment interest on both actual and additional damages. Point
twenty is overruled.
      All points of error having been overruled, we affirm the judgment.
 
                                                      BOB L. THOMAS
                                                      Chief Justice
Before Chief Justice Thomas,
      Justice Cummings, and
      Justice Vance
Affirmed
Opinion issued and filed January 10, 1996
Do not publish